## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

WILLIAM N. GRIFFIN,

      Plaintiff,

vs.                                                                          No. CIV 13-0799 JB/GBW

DANIEL A. BRYANT, individually and in his
capacity as Attorney for the Village of Ruidoso;
DANIEL A. BRYANT, PC, a New Mexico
professional corporation; GUS R. ALBORN,
individually and in his capacity as Mayor of the
Village of Ruidoso; DEBI LEE, individually
and in her capacity as Manager of the Village of
Ruidoso; IRMA DEVINE, individually and in
her capacity as Clerk for the Village of Ruidoso;
VILLAGE OF RUIDOSO, a Municipal
corporation,

      Defendants.

## MEMORANDUM OPINION AND ORDER ADOPTING IN PART MAGISTRATE JUDGE'S PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

**THIS MATTER** comes before the Court on: (i) the Ruidoso Defendants' Partial

Objection to Magistrate Judge's Proposed Findings and Recommended Disposition, filed

February 26, 2014 (Doc. 28)("Defendants' Objections"); and (ii) the Plaintiff's Response to

Proposed Findings and Recommended Disposition, filed February 26, 2014 (Doc. 29)("Griffin's

Objections").   The Honorable Gregory B. Wormuth, United States Magistrate Judge for the

District of New Mexico, submitted his Proposed Findings and Recommended Disposition, filed

February 12, 2014 (Doc. 27)("PFRD").   Judge Wormuth concluded that the Defendants are

entitled to summary judgment as to Counts 1, 2, and 4 of Plaintiff William N. Griffin's

complaint; that, as to Count 3, the Defendants are entitled to summary judgment as to Section 1

of the operative Village Resolution; but that Griffin is entitled to declaratory judgment as to the

"negative mention" provision of Section 5.   See Complaint for Violation of Civil Rights, Damages, and for Declaratory and Injunctive Relief ¶¶ 73-85, at 15-16, filed August 27, 2013 (Doc. 1)("Complaint"); id. ¶¶ 86-91, at 17; id. ¶¶ 101-102, at 19; id. ¶¶ 92-100, at 18-19; id. ¶¶ 98-100, at 18-19.   Griffin and the Defendants both filed Objections to the PFRD.   Having reviewed the PFRD and the Objections, the Court will adopt the PFRD in part and reject it in part, and grant in part and deny in part the Defendants' motion for summary judgment.   See The Ruidoso Defendants' Motion for Summary Judgment on Plaintiff's Complaint for Violation of Civil Rights, Damages, and for Declaratory and Injunctive Relief and Memorandum of Law in Support Thereof, filed October 14, 2013 (Doc. 16)("MSJ").   The Court will grant Griffin's request for declaratory relief in Claim 3 and injunctive relief in Claim 4 as they relate to Section 5 of the Resolution, and will dismiss all other claims in the Complaint.

## LAW REGARDING OBJECTIONS TO PROPOSED FINDINGS AND RECOMMENDATIONS

District courts may refer dispositive motions to a magistrate judge for a recommended disposition.   See Fed. R. Civ. P. 72(b)(1) ("A magistrate judge must promptly conduct the required proceedings when assigned, without the parties' consent, to hear a pretrial matter dispositive of a claim or defense . . . ."ate).   Rule 72(b)(2) governs objections: "Within 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations."   Fed. R. Civ. P. 72(b)(2). Finally, when resolving objections to a Magistrate Judge's proposal, "[t]he district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to.   The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions."   Fed. R. Civ. P. 72(b)(3).  Similarly, 28 U.S.C. § 636 provides:

> A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.  The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1)(C).

"'The filing of objections to a magistrate's report enables the district judge to focus attention on those issues -- factual and legal -- that are at the heart of the parties' dispute.'" United States v. One Parcel of Real Property, with Buildings, Appurtenances, Improvements, and Contents, 73 F.3d 1057, 1059 (10th Cir. 1996)(quoting Thomas v. Arn, 474 U.S. 140, 147 (1985))("One Parcel").  As the United States Court of Appeals for the Tenth Circuit has noted, "the filing of objections advances the interests that underlie the Magistrate's Act, including judicial efficiency."  One Parcel, 73 F.3d at 1059 (citing Niehaus v. Kan. Bar Ass'n, 793 F.2d 1159, 1165 (10th Cir. 1986); United States v. Walters, 638 F.2d 947, 950 (6th Cir. 1981)).

The Tenth Circuit has held "that a party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review."  One Parcel, 73 F.3d at 1060.  "To further advance the policies behind the Magistrate's Act, [the Tenth Circuit], like numerous other circuits, have adopted 'a firm waiver rule' that 'provides that the failure to make timely objections to the magistrate's findings or recommendations waives appellate review of both factual and legal questions.'"  One Parcel, 73 F.3d at 1059 (citations omitted).  In addition to requiring specificity in objections, the Tenth Circuit has stated that "[i]ssues raised for the first time in objections to the magistrate judge's recommendation are deemed waived."  Marshall v. Chater, 75 F.3d 1421, 1426 (10th Cir. 1996).  See United States v. Garfinkle, 261 F.3d 1421, 1426 (10th Cir. 1996)("In this circuit, theories raised for the first time in objections to the magistrate judge's report are

- 3 -

deemed waived.").  In an unpublished opinion, the Tenth Circuit stated that "the district court correctly held that [a petitioner] had waived [an] argument by failing to raise it before the magistrate."  Pevehouse v. Scibana, 229 F. App'x 795, 796 (10th Cir. 2007)(unpublished).[1]

In One Parcel, the Tenth Circuit, in accord with the other United States Courts of Appeals, expanded the waiver rule to cover objections that are timely but too general.  See One Parcel, 73 F.3d at 1060.  The Supreme Court of the United States -- in the course of approving the United States Court of Appeals for the Sixth Circuit's use of the waiver rule -- has noted:

> It does not appear that Congress intended to require district court review of a magistrate's factual or legal conclusions, under a de novo or any other standard, when neither party objects to those findings.  The House and Senate Reports accompanying the 1976 amendments do not expressly consider what sort of review the district court should perform when no party objects to the magistrate's report.  See S. Rep. No. 94-625, pp. 9-10 (1976)("Senate Report"); H.R. Rep. No. 94-1609, p. 11 (1976), U.S. Code Cong. & Admin. News 1976, p. 6162 ("House Report").  There is nothing in those Reports, however, that demonstrates an intent to require the district court to give any more consideration to the magistrate's report than the court considers appropriate.  Moreover, the Subcommittee that drafted and held hearings on the 1976 amendments had before it the guidelines of the Administrative Office of the United States Courts concerning the efficient use of magistrates.  Those guidelines recommended to the district courts that "[w]here a magistrate makes a finding or ruling on a motion or an issue, his determination should become that of the district court, unless specific

---

[1]Pevehouse v. Scibana is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court finds that Pevehouse v. Scibana has persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

objection is filed within a reasonable time." <u>See</u> Jurisdiction of United States Magistrates, Hearings on S. 1283 before the Subcommittee on Improvements in Judicial Machinery of the Senate Committee on the Judiciary, 94th Cong., 1st Sess., 24 (1975)(emphasis added)("Senate Hearings"). The Committee also heard Judge Metzner of the Southern District of New York, the chairman of a Judicial Conference Committee on the administration of the magistrate system, testify that he personally followed that practice. <u>See</u> Senate Hearings at 11 ("If any objections come in, . . . I review [the record] and decide it. If no objections come in, I merely sign the magistrate's order."). The Judicial Conference of the United States, which supported the de novo standard of review eventually incorporated in § 636(b)(1)(C)), opined that in most instances no party would object to the magistrate's recommendation, and the litigation would terminate with the judge's adoption of the magistrate's report. <u>See</u> Senate Hearings at 35, 37. Congress apparently assumed, therefore, that any party who was dissatisfied for any reason with the magistrate's report would file objections, and those objections would trigger district court review. There is no indication that Congress, in enacting § 636(b)(1)(C)), intended to require a district judge to review a magistrate's report to which no objections are filed. It did not preclude treating the failure to object as a procedural default, waiving the right to further consideration of any sort. We thus find nothing in the statute or the legislative history that convinces us that Congress intended to forbid a rule such as the one adopted by the Sixth Circuit.

<u>Thomas v. Arn</u>, 474 U.S. at 151-52 (footnotes omitted).

The Tenth Circuit also noted, "however, that '[t]he waiver rule as a procedural bar need not be applied when the interests of justice so dictate.'" <u>One Parcel</u>, 73 F.3d at 1060 (quoting <u>Moore v. United States</u>, 950 F.2d 656, 659 (10th Cir. 1991)("We join those circuits that have declined to apply the waiver rule to a pro se litigant's failure to object when the magistrate's order does not apprise the pro se litigant of the consequences of a failure to object to findings and recommendations." (citations omitted))). <u>Cf.</u> <u>Thomas v. Arn</u>, 474 U.S. at 154 (noting that, while "[a]ny party that desires plenary consideration by the Article III judge of any issue need only ask," a failure to object "does not preclude further review by the district judge, sua sponte or at the request of a party, under a de novo or any other standard"). In <u>One Parcel</u>, the Tenth Circuit noted that the district judge had decided sua sponte to conduct a de novo review despite the lack of specificity in the objections, but the Tenth Circuit held that it would deem the issues waived

on appeal because it would advance the interests underlying the waiver rule.  See 73 F.3d at 1060-61 (citing cases from other circuits where district courts elected to address merits despite potential application of waiver rule, but circuit courts opted to enforce waiver rule).

Where a party files timely and specific objections to the magistrate judge's proposed findings and recommendation on "dispositive motions, the statute calls for a de novo determination, not a de novo hearing."  United States v. Raddatz, 447 U.S. 667, 674 (1980). "[I]n providing for a 'de novo determination' rather than de novo hearing, Congress intended to permit whatever reliance a district judge, in the exercise of sound judicial discretion, chose to place on a magistrate's proposed findings and recommendations."  United States v. Raddatz, 447 U.S. at 676 (quoting 28 U.S.C. § 636(b))(citing Mathews v. Weber, 423 U.S. 261, 275 (1976)). The Tenth Circuit requires a "district court to consider relevant evidence of record and not merely review the magistrate judge's recommendation" when conducting a de novo review of a party's timely, specific objections to the magistrate's report.  In re Griego, 64 F.3d 580, 583-84 (10th Cir. 1995).  "When objections are made to the magistrate's factual findings based on conflicting testimony or evidence . . . the district court must, at a minimum, listen to a tape recording or read a transcript of the evidentiary hearing."  Gee v. Estes, 829 F.2d 1005, 1008-09 (10th Cir. 1987).

A district court must "clearly indicate that it is conducting a de novo determination" when a party objects to the magistrate's report "based upon conflicting evidence or testimony." Gee v. Estes, 829 F.2d at 1009.  On the other hand, a district court fails to meet the requirements of 28 U.S.C. § 636(b)(1) when it indicates that it gave "considerable deference to the magistrate's order."  Ocelot Oil Corp. v. Sparro Indus., 847 F.2d 1458, 1464 (10th Cir. 1988).  A district court need not, however, "make any specific findings; the district court must merely

conduct a de novo review of the record." Garcia v. City of Albuquerque, 232 F.3d 760, 766 (10th Cir. 2000). "[T]he district court is presumed to know that de novo review is required. Consequently, a brief order expressly stating the court conducted de novo review is sufficient." Northington v. Marin, 102 F.3d 1564, 1570 (10th Cir. 1996)(citing In re Griego, 64 F.3d at 583-84). "[E]xpress references to de novo review in its order must be taken to mean it properly considered the pertinent portions of the record, absent some clear indication otherwise." Bratcher v. Bray-Doyle Indep. Sch. Dist. No. 42, 8 F.3d 722, 724 (10th Cir. 1993). The Tenth Circuit has held that a district court properly conducted a de novo review of a party's evidentiary objections when the district court's "terse" order contained one sentence for each of the party's "substantive claims" and did "not mention his procedural challenges to the jurisdiction of the magistrate to hear the motion." Garcia v. City of Albuquerque, 232 F.3d at 766. The Tenth Circuit has explained that brief district court orders that "merely repeat[] the language of § 636(b)(1) to indicate its compliance" are sufficient to demonstrate that the district court conducted a de novo review:

> It is common practice among district judges in this circuit to make such a statement and adopt the magistrate judges' recommended dispositions when they find that magistrate judges have dealt with the issues fully and accurately and that they could add little of value to that analysis. We cannot interpret the district court's statement as establishing that it failed to perform the required de novo review.

In re Griego, 64 F.3d at 584.

Notably, because "Congress intended to permit whatever reliance a district judge, in the exercise of sound judicial discretion, chose to place on a magistrate's proposed findings and recommendations," United States v. Raddatz, 447 U.S. at 676 (emphasis omitted), a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate," 28 U.S.C. § 636(b)(1). See Bratcher v. Bray-Doyle Indep. Sch. Dist. No. 42, 8 F.3d

at 724-25 (holding that the district court's adoption of the magistrate judge's "particular reasonable-hour estimates" is consistent with the de novo determination that 28 U.S.C. § 636(b)(1) and United States v. Raddatz require).

Where no party objects to the Magistrate Judge's proposed findings and recommended disposition, the Court has, as a matter of course and in the interests of justice, reviewed the Magistrate Judge's recommendations.  In Pablo v. Soc. Sec. Admin., No. CIV 11-0132 JB/ACT, 2013 WL 1010401 (D.N.M. Feb. 27, 2013)(Browning, J.), the plaintiff failed to respond to the Magistrate Judge's proposed findings and recommended disposition, and thus waived his right to appeal the recommendations, but the Court nevertheless conducted a review.  See 2013 WL 1010401, at *1, *4.  The Court stated that it generally does not, however, "review the PF & RD de novo, because the parties have not objected thereto, but rather review[s] the recommendations to determine whether they are clearly erroneous, arbitrary, obviously contrary to law, or an abuse of discretion."  Pablo v. Soc. Sec. Admin., 2013 WL 1010401, at *4.  The Court, when there are no objections, does not determine independently what it would do if the issues had come before the Court first, but rather adopts the proposed findings and recommended disposition where "'the Court cannot say that the Magistrate Judge's recommendation . . . is clearly erroneous, arbitrary, obviously contrary to law, or an abuse of discretion.'"  Pablo v. Soc. Sec. Admin., 2013 WL 1010401, at *3 (alterations omitted)(footnote omitted)(quoting Workheiser v. City of Clovis, No. CIV 12-0485 JB/GBW, 2012 WL 6846401, at *3 (D.N.M. Dec. 28, 2012)(Browning, J.)).  See Alexandre v. Astrue, No. CIV 11-0384 JB/SMV, 2013 WL 1010439, at *4 (D.N.M. Feb. 27, 2013)(Browning, J.)("The Court rather reviewed the findings and recommendations . . . to determine if they are clearly erroneous, arbitrary, obviously contrary to law, or an abuse of discretion.  The Court determines that they are not, and will therefore adopt the PFRD.");

<u>Trujillo v. Soc. Sec. Admin.</u>, No. CIV 12-1125 JB/KBM, 2013 WL 1009050, at *5 (D.N.M. Feb. 28, 2013)(Browning, J.)(adopting the proposed findings and conclusions, and noting that "[t]he Court did not review the ARD de novo, because Trujillo has not objected to it, but rather reviewed the . . . findings and recommendation to determine if they are clearly erroneous, arbitrary, obviously contrary to law, or an abuse of discretion, which they are not.").   This review, which is deferential to the Magistrate Judge's work when there is no objection, nonetheless provides some review in the interest of justice, and seems more consistent with the waiver rule's intent than no review at all or a full-fledged de novo review.   Accordingly, the Court considers this standard of review appropriate.   See <u>Thomas v. Arn</u>, 474 U.S. at 151 ("There is nothing in those Reports, however, that demonstrates an intent to require the district court to give any more consideration to the magistrate's report than the court considers appropriate.").   The Court is reluctant to have no review at all if its name is going at the bottom of the order or opinion adopting the Magistrate Judge's proposed findings and recommendations.

## LAW REGARDING PRIOR RESTRAINTS ON SPEECH

"[P]rior restraints on speech and publication are the most serious and least tolerable infringement on First Amendment rights." <u>Neb. Press Ass'n v. Stuart</u>, 427 U.S. 539, 559 (1976). "Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity." <u>N.Y. Times v. United States</u>, 403 U.S. 713, 714 (1971).   Prior restraints are viewed as more invidious than after the fact speech restrictions, yet it can be difficult to determine: (i) when a speech restriction is a prior restraint; and (ii) what standard of judicial review judges should apply to speech restrictions once they have determined that the restriction is a prior restraint.

1.      **Prior Restraint Defined.**

In the abstract, prior restraints are contrasted against restrictions that provide for subsequent punishment.  Dean Erwin Chemerinsky provides the following guidance in his hornbook:

> It is too broad to say that a prior restraint is a government action that prevents speech from occurring. All laws outlawing speech would constitute prior restraints by this definition.  Nor is the traditional distinction between censorship before speech and after the fact punishments sufficient.  All punishment for speech -- whether under prior restraints or other laws -- occurs after the expression takes place.  All government actions regulating speech -- whether prior restraints or not -- exist before the speech occurs.
>
>         The clearest definition of prior restraint is as an administrative system or a judicial order that prevents speech from occurring. . . .

Erwin Chemerinsky, Constitutional Law: Principles and Policies § 11.2.3.1, at 949-50 (3d ed. 2006).

The best way to determine whether a given speech restriction is a prior restraint is to consider the reasons for the heightened skepticism towards prior restraints in the first place and determine whether the speech restriction in question implicates those reasons.  It is not immediately obvious why prior restraints are disfavored.  In many ways, front-end suppression of speech seems preferable to back-end penal or even monetary sanctions.  If the speech is ultimately to be restricted anyway, it seems to comport more with due process for the speaker to have the opportunity to argue his case and ascertain the legality of his speech before speaking, and prior restraints are more conducive to front-end First Amendment analyses.  Speech restrictions that provide for subsequent punishment, on the other hand, force the speaker to risk punishment to even challenge the speech restriction; if the speaker speaks and is punished, and the courts subsequently uphold the speech restriction against a First Amendment challenge, then the speaker cannot avoid punishment because the restricted speech has already been said.  The

uncertainty attendant to subsequent punishment speech restrictions thus leads to a chilling effect whereby would-be speakers are intimidated from engaging in constitutionally-protected speech, because -- lacking a definitive front-end ruling from the courts -- they fear that their speech may be proscribed by the speech restriction and unprotected by the First Amendment.  See Lamont v. Postmaster Gen., 381 U.S. 301, 307-10 (1965).  The Supreme Court has recognized the dangers of speech restrictions that subsequently punish -- these considerations played a key role in the formation of the overbreadth and void-for-vagueness doctrines -- but they still reserve special suspicion for prior restraints.

Some of this animus is historical, carried over from judicial opposition to the English Crown's licensing system for publications.  See 4 William Blackstone, Commentaries *151-152 ("[T]he liberty of the press is, indeed essential to the nature of a free state; but this consists in laying no previous restraints upon publication, and not in freedom from censure for criminal matter when published.").  Other reasons remain viable today:

> A system of prior restraint is in many ways more inhibiting than a system of subsequent punishment: It is likely to bring under government scrutiny a far wider range of expression; it shuts off communication before it takes place; suppression by a stroke of the pen is more likely to be applied than suppression through a criminal process; the procedures do not require attention to the safeguards of the criminal process; the system allows less opportunity for public appraisal and criticism; the dynamics of the system drive toward excesses, as the history of all censorship shows.

Thomas Emerson, The System of Freedom of Expression 506 (1970).

Perhaps the most compelling rationale for the distinction between prior restraints and subsequent punishment is the collateral bar rule.  The collateral bar rule provides that when a specific individual is restrained from expression -- as by an injunction or the denial of a permit, not through the enforcement of laws applicable to everyone in the general public -- he must challenge the restraint directly, without first violating it.  The collateral bar rule appears to be

based upon the conception that, while citizens need not obey an unconstitutional law, they must respect the judiciary's decision whether that law is constitutional.   In Walker v. City of Birmingham, 388 U.S. 307 (1967), an Alabama state court enjoined a group of civil rights protestors, including Dr. Martin Luther King, Jr., from, "among other things, participating in or encouraging mass street parades or mass processions without a permit as required by a Birmingham ordinance." 388 U.S. at 309.  The protestors defied the injunction, holding a large march on the city streets, and were arrested and convicted of contempt of court.  See 388 U.S. at 311-12.  Both the Supreme Court of Alabama and the Supreme Court of the United States refused to rule on the constitutionality of the Birmingham ordinance upon which the injunction was based, instead holding that the only question that mattered was whether the protestors had violated a facially valid injunction issued by a court of proper jurisdiction.  388 U.S. at 312-13, 320-21.  The Supreme Court of the United States held that the protestors could not challenge the constitutionality of the ordinance, because they had not been arrested for violation of the ordinance itself, but rather for violation of a court order fashioned to prevent violations of the ordinance.  None of the elements of contempt of court implicated the First Amendment.  See 388 U.S. at 318.  Moreover, because the prior restraint -- the injunction -- could be challenged directly at the time of its issuance without the protestors having to first violate it to gain standing, the protestors' actions evinced disrespect not only for the possibly unconstitutional ordinance, but for the judiciary's as-yet untested willingness and ability to evaluate the ordinance's constitutionality.[2]  See 388 U.S. at 316-19. As the divided Supreme Court wrote:

---

[2]The petitioners made their distrust of the state judiciary clear at a press conference after the injunction was issued.  "At the press conference one of the petitioners stated: 'That they had respect for the Federal Courts, or Federal Injunctions, but in the past the State Courts had favored local law enforcement, and if the police couldn't handle it, the mob would.'"  Walker v. City of Birmingham, 388 U.S. at 310 (quotation unattributed).

This case would arise in quite a different constitutional posture if the petitioners, before disobeying the injunction, had challenged it in the Alabama courts, and had been met with delay or frustration of their constitutional claims. But there is no showing that such would have been the fate of a timely motion to modify or dissolve the injunction.  There was an interim of two days between the issuance of the injunction and the Good Friday march.  The petitioners give absolutely no explanation of why they did not make some application to the state court during that period.  The injunction had issued ex parte; if the court had been presented with the petitioners' contentions, it might well have dissolved or at least modified its order in some respects.  If it had not done so, Alabama procedure would have provided for an expedited process of appellate review.  It cannot be presumed that the Alabama courts would have ignored the petitioners' constitutional claims. . . .

. . . .

The rule of law that Alabama followed in this case reflects a belief that in the fair administration of justice no man can be judge in his own case, however exalted his station, however righteous his motives, and irrespective of his race, color, politics, or religion.  This Court cannot hold that the petitioners were constitutionally free to ignore all the procedures of the law and carry their battle to the streets.  One may sympathize with the petitioners' impatient commitment to their cause.  But respect for judicial process is a small price to pay for the civilizing hand of law, which alone can give abiding meaning to constitutional freedom.

Walker v. City of Birmingham, 388 U.S. at 318-19, 320-21 (footnotes omitted).

The collateral bar rule stands today.  As long as an injunction is issued pursuant to proper procedure and is not "transparently invalid or ha[ving] only a frivolous pretense to validity," it must be obeyed and challenged directly, not defied; contempt of court trials are not appropriate vehicles to challenge the statutes that underlie the violated court orders.  The Supreme Court has also applied the collateral bar rule to licensing schemes, although the rule is relaxed in this context: when a litigant has been denied a license and defies that denial by participating in the licensed expression anyway, he may challenge the licensing scheme, as a whole, as unconstitutional; but he may not challenge his particular denial or restriction as an unconstitutional application of a facially constitutional licensing scheme.  Compare Poulos v.

- 13 -

New Hampshire, 345 U.S. 395, 409 (1953)(holding that a where a facially valid licensing scheme had resulted in the denial of a permit to perform a religious service in a public park, the denial must be attacked directly, not by way of violation and collateral attack), with Shuttlesworth v. City of Birmingham, 394 U.S. 147, 151 (1969)(holding that where a licensing scheme is facially invalid for lack of procedural safeguards or unbridled discretion, "a person faced with such an unconstitutional licensing law may ignore it and engage with impunity in the exercise of the right of free expression for which the law purports to require a license").

The collateral bar rule cuts off citizens' ability to speak in the face of prior restraints, even if the citizen is confident and correct that the restraint is unconstitutional.  Prior restraints, thus, have the effect of absolutely suppressing speech, with no opportunity for after-the-fact vindication by the speaker, at least until they are challenged and overturned.  If the prior restraint is never challenged -- for example, if the restrained individual lacks the resources to fight the government in court -- then it acts to permanently prevent the restricted speech from entering the marketplace of ideas.

Courts have been most likely to find that a speech restriction is a prior restraint when the collateral bar rule would apply to a violation of the restriction.  "In practice, most prior restraints involve either an administrative rule requiring some form of license or permit before one may engage in expression, or a judicial order directing an individual not to engage in expression, on pain of contempt."  Rodney Smolla, Smolla and Nimmer on Freedom of Speech § 15:1 (2014). These two forms of prior restraint share another invidious feature, in addition to the applicability of the collateral bar rule: they are individualized decisions, in which the identity of the speaker, and often the exact content of the message, are known in advance of the creation of the prior restraint.

2.      **The Standard of Judicial Review Applicable to Prior Restraints.**

"Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity." Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70 (1963). Prior restraints must be narrowly tailored to be the least restrictive means for achieving a significant government interest. See California v. Yamasaki, 442 U.S. 682, 702 (1979); Carroll v. President & Comm'rs of Princess Ann, 393 U.S. 175, 183 (1968)("[Prior restraints] must be couched in the narrowest terms that will accomplish the pin-pointed objective permitted by constitutional mandate and the essential needs of the public order."). In evaluating the constitutionality of prior restraints, courts "must ask . . . whether the challenged provisions of the injunction burden no more speech than necessary to serve a significant government interest." Madsen v. Women's Health Ctr., 512 U.S. 753, 765 (1994). Although this standard is very close to strict scrutiny, it does not require that the prior restraint serve a "compelling state interest," but merely a significant one.[3] Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45 (1983)(reciting the strict scrutiny standard). This standard is the minimum scrutiny applied to all prior restraints; if the content of the restriction -- not merely its manner of enforcement as a prior restraint -- itself triggers strict scrutiny, then strict scrutiny applies. See Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. at 45 (holding that strict scrutiny applies to a prior restraint enforcing a content-based restriction on speech in a traditional public forum). Holding otherwise would result in the perverse outcome that a prior restraint would be subjected to lower scrutiny than an otherwise identical speech restriction providing for subsequent punishment.

_____

[3]The Tenth Circuit has said that significant government interests "include public safety, accommodating competing uses . . . , controlling the level and times of noise, and similar interests." First Unitarian Church of Salt Lake City v. Salt Lake City Corp., 308 F.3d 1114, 1132 (10th Cir. 2002).

This standard, which retains the tailoring aspect of strict scrutiny while softening the government interest prong, is a sensible one to apply to prior restraints. The concern with prior restraints is not so much with their core substantive content, but with their scope, with their preemptive nature, and with the individualized manner of their enforcement. The requirement of narrow tailoring and least restrictive means mirrors and amplifies the standard for overbreadth challenges, which are often unavailable for prior restraints because of the collateral bar rule. On the other hand, if a narrow, easily delineable category of speech clearly unprotected by the First Amendment is to be restricted, whether the restriction may be justified only on the basis of a compelling state interest or may be justified by any significant state interest, should not turn on whether the restriction operates before or after the speech occurs.

The Supreme Court has elaborated on the scrutiny courts should apply to prior restraints in a few specific contexts, notably, prior restraints in the name of national security and prior restraints to protect the fairness of criminal trials.

> a. **The Troopship Exception: Restraints on News Publications Justified by National Security.**

The national security context appears to be the setting in which prior restraints may be most often found constitutional, but the Supreme Court has emphasized that the courts are not to be deferential to the government merely because national security is raised as a justification. See New York Times v. United States, 403 U.S. 713 (1971)(per curiam). The Supreme Court first countenanced the idea of a troopship exception in Near v. Minnesota, 283 U.S. 697, 716 (1931). That case involved a court order enjoining the publication of libelous material, but the Supreme Court, after striking down the injunction as unconstitutional, outlined the potential exception: "No one would question but that a government might prevent actual obstruction to its recruiting

service or the publication of the sailing dates of transports or the number and location of troops." 283 U.S. at 716.

This exception was first analyzed in <u>New York Times v. United States</u>.  <u>See</u> 403 U.S. at 714.  In that case, the Supreme Court refused the United States of America's request for an injunction enjoining the <u>New York Times</u> and the <u>Washington Post</u> from publishing a classified government study entitled <u>History of U.S. Decision-Making Process on Viet Nam Policy</u>, a.k.a. the Pentagon Papers.  <u>See</u> 403 U.S. at 714.  The United States had argued that publication of the document would jeopardize the ongoing war efforts.  <u>See</u> Brief for the United States, 1971 WL 167581, at *13-20.  Although the per curiam opinion was short and fact-specific, several Justices wrote separately to outline their views on the appropriate standard for prior restraints.  The Honorable Hugo L. Black and the Honorable William O. Douglas, Associate Justices of the Supreme Court, concurred, strongly implying that no prior restraint on news publication would ever be acceptable:

> I adhere to the view that the Government's case against the Washington Post should have been dismissed and that the injunction against the New York Times should have been vacated without oral argument when the cases were first presented to this Court.  I believe that every moment's continuance of the injunctions against these newspapers amounts to a flagrant, indefensible, and continuing violation of the First Amendment.  Furthermore, after oral argument, I agree completely that we must affirm the judgment of the Court of Appeals for the District of Columbia Circuit and reverse the judgment of the Court of Appeals for the Second Circuit for the reasons stated by my Brothers DOUGLAS and BRENNAN.  In my view it is unfortunate that some of my Brethren are apparently willing to hold that the publication of news may sometimes be enjoined.  Such a holding would make a shambles of the First Amendment.

> Our Government was launched in 1789 with the adoption of the Constitution.  The Bill of Rights, including the First Amendment, followed in 1791.  Now, for the first time in the 182 years since the founding of the Republic, the federal courts are asked to hold that the First Amendment does not mean what it says, but rather means that the Government can halt the publication of current news of vital importance to the people of this country.

403 U.S. at 714-15 (Black, J., concurring, joined by Douglas, J.).   Justice Douglas wrote separately to add: "It should be noted at the outset that the First Amendment provides that 'Congress shall make no law . . . abridging the freedom of speech, or of the press.'   That leaves, in my view, no room for governmental restraint on the press."   403 U.S. at 720 (Douglas, J., concurring)(quoting U.S. Const. amend. I).

The Honorable William J. Brennan, Associate Justice of the Supreme Court, was only slightly more amenable to prior restraints, setting forth a standard of scrutiny so strict that it might more aptly be characterized as an exception to a blanket rule against them: "[O]nly governmental allegation and proof that publication must inevitably, directly, and immediately cause the occurrence of an event kindred to imperiling the safety of a transport already at sea can support even the issuance of an interim restraining order."   403 U.S. at 726-27 (Brennan, J., concurring).   The Honorable Potter Stewart, the Honorable Byron R. White, and the Honorable Thurgood Marshall, Associate Justices of the Supreme Court, were more tepid in their categorical opposition to prior restraints, relying heavily on the United States' lack of statutory authorization for the injunction -- the United States' relied on the executive's inherent power to justify the injunction.   See 403 U.S. at 730-31 (White, J., concurring, joined by Stewart, J.); 403 U.S. at 740 (Marshall, J., concurring).   Three Justices dissented, and would have allowed the injunction, and, of course, none of the Justices from that era are on the Supreme Court today. Given that the Supreme Court has not returned to this issue, the Court cannot know with certainty the scope of the troopship exception or the showing to demand from the government, except that it is safe to conclude that the government must shoulder a heavy burden.

b.     **Gag Orders: Prior Restraints to Protect Fair Trials for Criminal Defendants.**

The Supreme Court has outlined a three-prong test for evaluating gag orders -- injunctions issued to prevent the press from publishing information relating to an ongoing or forthcoming trial -- that results in their almost never being found constitutional.  See Neb. Press Ass'n v. Stuart, 427 U.S. 539 (1976).   A gag order may only be entered for the benefit of the defendant, not the prosecution, and the defendant must show that: (i) without a prior restraint, publicity would "impair the defendant's right to a fair trial" by irrevocably tainting the jury pool, 427 U.S. at 562-63; (ii) "measures short of an order restraining all publication [will not] insure[] the defendant a fair trial," 427 U.S. at 563; and (iii) it is likely that an injunction will effectively secure a fair trial for the defendant, see 427 U.S. at 565.   Although this test does not initially appear all that rigorous, Dean Chemerinsky writes that it is tantamount to an absolute ban on gag orders.   See Chemerinsky, supra, § 11.2.3.3, at 962.   Attempts to satisfy the first prong are undermined by a number of high-publicity prosecutions that resulted in acquittals, including the O.J. Simpson case, the McMartin Preschool case,[4] and the rape trial of William Kennedy Smith.  See Chemerinsky, supra, § 11.2.3.3, at 962.   Satisfaction of the second

---

[4]Wikipedia describes the case as follows:

The McMartin preschool trial was a day care sexual abuse case of the 1980s.   Members of the McMartin family, who operated a preschool in California, were charged with numerous acts of sexual abuse of children in their care.   Accusations were made in 1983.   Arrests and the pretrial investigation ran from 1984 to 1987, and the trial ran from 1987 to 1990.   After six years of criminal trials, no convictions were obtained, and all charges were dropped in 1990.   When the trial ended in 1990 it had been the longest and most expensive criminal trial in American history.   The case was part of day care sex abuse hysteria, a moral panic over alleged Satanic ritual abuse in the 1980s and early 1990s.

McMartin Preschool Trial, Wikipedia, http://en.wikipedia.org/wiki/McMartin_preschool_trial.

prong is stymied largely by the availability of changes in venue and the conducting of extensive voir dire.  The third prong tends to catch those few cases that survive the first two, as any case in which media coverage is so extensive and invidious as to be unfixable by voir dire and change of venue would likely still be stymied by publicity from sources outside the jurisdiction of the enjoining court.  Chemerinsky, supra, § 11.2.3.3, at 962.  Dean Chemerinsky also notes that "three Justices -- Brennan, Stewart, and Marshall -- took the position that prior restraints never would be justified to protect a defendant's right to a fair trial, and a fourth, Justice White, expressed 'grave doubt' that such a prior restraint ever would be justified."  Chemerinsky, supra, § 11.2.3.3, at 962 n.183 (citations omitted).

### LAW REGARDING FIRST-AMENDMENT OVERBREADTH CHALLENGES

An overbreadth challenge is a facial challenge to a speech-restricting statute on First Amendment grounds, and, if successful, it results in the invalidation of the entire statute.  To succeed, the challenged statute must regulate substantially more expression than the First Amendment allows to be regulated.  See Schad v. Borough of Mt. Ephraim, 452 U.S. 61 (1981). The party challenging the statute need not have been engaged in constitutionally protected expression to have standing to challenge the law; even if the law is constitutional as applied to the challenging party, if the law is found to be overbroad, it is invalid in its entirety.  See Village of Schaumburg v. Citizens for a Better Env't, 444 U.S. 620, 634 (1980)("Given a case or controversy, a litigant whose own activities are unprotected may nevertheless challenge a statute by showing that it substantially abridges the First Amendment rights of other parties not before the court."  (citations omitted)).   There are, thus, two aspects of an overbreadth challenge that set it apart from other facial challenges: the substantive aspect and the standing aspect.

1.      __The Substantive Aspect: Inverting the Usual Rule for Facial Challenges__.

Outside of the First-Amendment context, for a party to succeed in facially challenging a statute, "the challenger must establish that no set of circumstances exists under which the Act would be valid."[5]  United States v. Salerno, 481 U.S. 739, 745 (1987).  Overbreadth is not quite

---

[5]The Tenth Circuit and leading commentators contend that United States v. Salerno's formulation is neither normatively desirable nor -- more importantly for the Court's purposes -- descriptively accurate.

> [I]n *City of Chicago v. Morales*, [527 U.S. 41, 55 n.22 (1999),] a plurality of the Court asserted that "[t]o the extent that we have consistently articulated a clear standard for facial challenges, it is not the *Salerno* formulation, which has never been the decisive factor in any decision of this Court, including *Salerno* itself."

> . . . .

> *Salerno*'s language thus is accurately understood not as setting forth a test for facial challenges, but rather as describing the *result* of a facial challenge in which a statute fails to satisfy the appropriate constitutional standard.  In other words, where a statute fails the relevant constitutional test (such as strict scrutiny, the *Ward* test, or reasonableness review), it can no longer be constitutionally applied to anyone -- and thus there is "no set of circumstances" in which the statute would be valid.  The relevant constitutional test, however, remains the proper inquiry.

Doe v. City of Albuquerque, 667 F.3d 1111, 1125-26, 1127 (10th Cir. 2012)(emphasis in original).  See Richard H. Fallon, Jr., Fact and Fiction About Facial Challenges, 99 Cal. L. Rev. 915, 936-49 (2011)(examining empirical evidence and concluding that the Supreme Court regularly facially invalidates laws, and ignores the purported standard when it does); Richard H. Fallon, Jr., As-Applied and Facial Challenges and Third-Party Standing, 113 Harv. L. Rev. 1321, 1322-23, 1342-43 (2000); Michael C. Dorf, Facial Challenges to State and Federal Statutes, 46 Stan. L. Rev 235, 239-42 (1994)("[T]he *Salerno* opinion cites no direct authority to support its truly draconian standard.").  If this standard were taken seriously, virtually no statute would ever be invalidated.  A statute criminalizing male-male sexual relations would be constitutional, because it could validly be applied to nonconsensual male-male sexual relations.  See Lawrence v. Texas, 539 U.S. 558 (2003)(striking down a male-male sodomy law without ever using the term "facial challenge" or reciting any recognizable standard of the same).  It is not clear how this standard even could be applied to Equal Protection challenges, invidious purpose challenges, procedural rights challenges, or challenges that a law falls outside of the federal government's enumerated powers; how it can be squared with void-for-vagueness doctrine; or whether and how it affects severability analysis.  See Citizens United v. FEC, 558 U.S. 310, 331 (2010)("[T]he distinction between facial and as-applied challenges is not so well defined that it

the 180-degree reverse of this standard -- which would be that a law is unconstitutional if it proscribes any constitutionally protected speech -- but instead invalidates only those laws whose "overbreadth is substantial."  Bd. of Airport Comm'rs of L.A. v. Jews for Jesus, Inc., 482 U.S. 569, 574 (1987).  The usual burden of proof in attacking the constitutionality of a statute is switched in the First Amendment context, so that the government "bears the burden of establishing [the law's] constitutionality," ACORN v. Municipality of Golden, 744 F.2d 739, 746 (10th Cir. 1984), and the usual presumption that a statute is constitutional is negated, see Doe v. City of Albuquerque, 667 F.3d 1111, 1120 (10th Cir. 2012)(Ebel, J.)("[A]s a general matter, we give all statutes a presumption of constitutionality and we must apply the same presumption to . . . ordinances.  However, this presumption does not apply when the challenged statute infringes upon First Amendment rights."   (omission in original)(citations omitted)(internal quotation marks omitted)).

An example of a successful overbreadth challenge occurred in Schad v. Borough of Mt. Ephraim, 452 U.S. at 61.  In that case, a club that featured nude dancing challenged a city ordinance that purported to ban all live entertainment in commercial zones.[6]  See 452 U.S. at 63-64.  Although the Supreme Court has since determined that the First Amendment does not protect nude dancing, see Barnes v. Glen Theatre, Inc., 501 U.S. 560 (1991), the ordinance banned a substantial swath of activities -- such as "plays, concerts, musicals, dance," and athletic

---

has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge.").

[6]The Borough of Mt. Ephraim argued that the zoning ordinance constituted a "reasonable time, place, and manner restriction."  452 U.S. at 74.  The Supreme Court replied that, "[t]o be reasonable, time, place, and manner restrictions not only must serve significant state interests but also must leave open adequate alternative channels of communication.  Here, the Borough totally excludes all live entertainment . . . ."  452 U.S. at 75-76 (some citations omitted)(citing Grayned v. City of Rockford, 408 U.S. 104, 116 (1972)).

events -- that the First Amendment protected, Schad v. Borough of Mt. Ephraim, 452 U.S. at 66. The Supreme Court did not do as they might have done in non-First Amendment settings and narrowly interpret the ordinance to ban only constitutionally unprotected speech, but rather stuck the ordinance down entirely as overbroad.  See 452 U.S. at 66.

"[T]he overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." Broadrick v. Oklahoma, 413 U.S. 601, 615-16 (1973).  In Broadrick v. Oklahoma, the Supreme Court upheld a state law, patterned on the federal Hatch Act of 1939, 5 U.S.C. §§ 7321-7326, that barred government employees from engaging in partisan political activities.  See 413 U.S. at 615-16.  On its face, the statute could be construed to ban forms of expression, like wearing partisan buttons and displaying partisan bumper stickers on vehicles, that both parties agreed the First Amendment protected.[7]  413 U.S. at 615-16.  The State Personnel Board, the body charged with enforcing the statute and disciplining noncompliant employees, had, however, internally interpreted the statute to ban only unprotected speech, and the disciplined plaintiff-employees had not been engaged in protected speech, but merely sought to invalidate the law on the basis of the theoretical unconstitutional applications.  See 413 U.S. at 615-16.  The Supreme Court held that the statute was "not substantially overbroad and that whatever overbreadth may exist should be cured through case-

---

[7]Government employees do not receive the same level of First Amendment protection from adverse employment actions, e.g., firings, that citizens do from adverse government action, e.g., penal or civil sanctions, discrimination on the basis of speech (content-based speech regulation), compelled speech, or the conditioning of a benefit.  See Chemerinsky, supra, § 11.2.4.1, at 969; id. § 11.3.8.1, at 1112.  Government employees are protected from adverse employment actions only on the basis of speech if: (i) the speech is "on a matter of public concern," Connick v. Myers, 461 U.S. 138, 146 (1983); and (ii) the government's needs, "as an employer, in promoting the efficiency of the public services it performs through its employees," Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968), do not -- when balanced against the speech rights of the employee -- justify the speech restriction.

by-case analysis of the fact situations to which its sanctions, assertedly, may not be applied."

413 U.S. at 615-16.

As to where the line is between insubstantial overbreadth and substantial overbreadth, the

Supreme Court has stated:

> The concept of substantial overbreadth is not readily reduced to an exact definition.  It is clear, however, that the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge.  On the contrary, the requirement of substantial overbreadth stems from the underlying justification for the overbreadth exception itself -- the interest in preventing an invalid statute from inhibiting the speech of third parties who are not before the Court.

> "The requirement of substantial overbreadth is directly derived from the purpose and nature of the doctrine.  While a sweeping statute, or one incapable of limitation, has the potential to repeatedly chill the exercise of expressive activity by many individuals, the extent of deterrence of protected speech can be expected to decrease with the declining reach of the regulation."  New York v. Ferber, 458 U.S. 747, 772 (1982).  In short, there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds.

Members  of  the  City  Council  of  L.A.  v.  Taxpayers  for  Vincent, 466  U.S.  789,  800-01

(1984)(footnote omitted)(citations omitted).

When assessing whether an overbroad statute is likely to chill third parties from engaging

in protected expression, courts should assess not only whether the number of unconstitutional

potential applications of the statute is significant relative to the overall number of applications,

but the level of interpretive discretion given to those in charge of its enforcement, and the

likelihood of capricious enforcement.  In City of Houston, Tex. v. Hill, 482 U.S. 451 (1987), the

Supreme Court struck down as overbroad a city ordinance making it a crime "for any person to

assault, strike or in any manner oppose, molest, abuse or interrupt any policeman in the

execution of his duty."  482 U.S. at 455 (quoting Code of Ordinances, City of Houston, Tex.

§ 34-11(a) (1984)).  The Supreme Court held that the ordinance was "not narrowly tailored to prohibit only disorder conduct or fighting words," 482 U.S. at 465, and "criminalizes a substantial amount of constitutionally protected speech, and accords the police unconstitutional discretion in enforcement," 482 U.S. at 466.  The Supreme Court explained:

> As the Court observed over a century ago, "[i]t would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large."  United States v. Reese, 92 U.S. (2 Otto) 214, 221 (1876).
>
> . . . .
>
> The ordinance's plain language is admittedly violated scores of times daily, yet only some individuals -- those chosen by the police in their unguided discretion -- are arrested.  Far from providing the "breathing space" that "First Amendment freedoms need . . . to survive," NAACP v. Button, 371 U.S. 415, 433 (1963), the ordinance is susceptible of regular application to protected expression.

City of Houston, Tex. v. Hill, 482 U.S. at 465-67 (citations to the record omitted).  The Court presumes that, assuming the same level of overbreadth, the threat of criminal sanctions produces a stronger chilling effect than that of civil monetary sanctions, directions to cease and desist, or exposure to civil liability.

Last, some commentators have suggested that, when considering whether a statute's overbreadth is substantial, courts should take into account the importance of the protected speech being restricted or chilled.  See Richard Fallon, Jr., Making Sense of Overbreadth, 100 Yale L.J. 853, 894 (1991).  Under this view, a statute that chills a swath of political speech should be more readily facially invalidated than one that chills sexual, frivolous, or even artistic speech -- the latter statute being more amenable to as-applied challenges.  Although the Supreme Court has not endorsed this view explicitly, it has held that "the overbreadth doctrine does not apply to

commercial speech." Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 497 (1982).

### 2.    The Standing Aspect: The Near Abolition of Prudential Standing Factors.

A non-First Amendment, non-overbreadth facial challenge is always more difficult to mount than an as-applied challenge to the same statute. See United States v. Salerno, 481 U.S. at 745. An as-applied challenge requires only that the law is unconstitutional as applied to the challenger's case; a facial challenge requires this showing as well,[8] and also requires that there exists "no [other, theoretical] set of circumstances" in which the law could be constitutionally applied. A successful as-applied challenge is, thus, a necessary, but not sufficient, ingredient to a successful facial challenge. The Supreme Court has attributed the relative difficulty of facial and as-applied challenges to the Case or Controversy Clause, U.S. Const. art. III, § 2, cl. 1, specifically its standing requirement[9]:

> Embedded in the traditional rules governing constitutional adjudication is the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court. A closely related principle is that constitutional rights are personal and may not be asserted vicariously. These principles rest on more than the fussiness of judges. They reflect the conviction that under our constitutional system courts are not roving commissions assigned to pass judgment on the validity of the Nation's laws. Constitutional judgments, as Mr. Chief Justice Marshall recognized, are justified only out of the necessity of adjudicating rights in particular cases between the litigants brought before the Court.

--------

[8]A logical consequence of there being "no set of circumstances" wherein the law would be constitutional is that the manner in which the law was applied in the challenger's case must also be unconstitutional.

[9]Standing is not the only reason that facial challenges are disfavored. Other cases speak of "[f]acial adjudication carr[ying] too much promise of 'premature interpretatio[n] of statutes' on the basis of barebones records." Sabri v. United States, 541 U.S. 600, 609 (2004)(quoting United States v. Raines, 362 U.S. 17, 22 (1960)).

Broadrick v. Oklahoma, 413 U.S. at 610 (citations omitted).

The relative difficulty of mounting facial and as-applied challenges is almost, but not entirely, reversed in the context of a First Amendment overbreadth challenge.  Although a successful as-applied challenge does not guarantee a victorious facial challenge -- the court could find the statute's overbreadth insubstantial -- it is not necessary to have a viable as-applied challenge to succeed on a facial challenge.  "[W]here the claim is that a statute is overly broad in violation of the First Amendment, . . . [there is] no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity."  Sec'y of State of Md. v. Joseph H. Munson Co., Inc., 467 U.S. 947, 957 (1984).  Even if the challenger engaged in constitutionally unprotected, validly penalized speech, if he can establish that the statute penalizes a substantial swath of protected speech, then he will prevail in getting the statute invalidated not only as it relates to the constitutionally protected speech of others, but to his own unprotected speech, as well.  For example, if a statute criminalized "demeaning, threatening, or inflammatory words," a challenger arrested for using "fighting words" in a bar -- unprotected speech which may be validly criminalized under Chaplinsky v. New Hampshire, 315 U.S. 568 (1942) -- could challenge the law on behalf of third parties who might risk arrest for constitutionally protected demeaning or inflammatory words.  See Goading v. Wilson, 405 U.S. 518 (1972)(invalidating a Georgia law making it a crime for "[a]ny person [to], without provocation, use . . . opprobrious words or abusive language, tending to cause a breach of the peace").

The relaxation of the usual standing rules in the overbreadth context goes further than simply allowing an individual to whom the law is constitutionally applied to sue on the basis of unconstitutional applications.  The challenged law need not have been applied against the

challenger at all; as long as the barebones requirements of Article III standing are met,[10] the elements of prudential standing are presumed satisfied in an overbreadth challenge.[11]   In Secretary of State of Maryland v. Joseph H. Munson Co., Inc., the Supreme Court allowed a professional fundraising company to bring suit challenging a state statute that prohibited charities from soliciting funds unless at least seventy-five percent of their revenue was used for charitable purposes.  See 467 U.S. at 949.  The Supreme Court held that the plaintiff had standing, even though the law had not been and, indeed -- as the company was not a charity -- could not be applied against it:

> [T]he Secretary's most serious argument against allowing Munson to challenge the statute is that there is no showing that a charity cannot bring its own lawsuit. Although such an argument might defeat a party's standing outside the First Amendment context, this Court has not found the argument dispositive in determining whether standing exists to challenge a statute that allegedly chills free speech.  To the contrary, where the claim is that a statute is overly broad in violation of the First Amendment, the Court has allowed a party to assert the rights of another without regard to the ability of the other to assert his own claims and "'with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow

_____

[10]Establishing Article III standing requires three components: (i) an injury in fact, which is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical,"; (ii) causation between the injury in fact and the conduct complained of, such that the injury is fairly traceable to the challenged action; and (iii) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."   Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)(Scalia, J.)(internal quotation marks omitted)(citations omitted).

[11]A leading commentator offers a possible justification for the virtual abandonment of standing doctrine in the context of overbreadth challenges that also explains the concept of "taxpayer standing" for suits brought under the Establishment Clause: the grammar of Constitution's text.  Nicholas Q. Rosenkranz, The Subjects of the Constitution, 62 Stan. L. Rev. 1209, 1250-57, 1257-63 (2010).  The thrust of the argument is that, while all the other provisions of the Bill of Rights are written in passive voice, the First Amendment provides that "Congress shall make no law . . . ."  U.S. Const. amend. I.  See Rosenkranz, supra, at 1250.  Professor Rosenkranz suggests that, while the Constitution contemplates that, for example, Fourth Amendment harm occurs at the point when an unreasonable search occurs, First Amendment injury occurs when Congress passes the infringing law.

- 28 -

specificity.'"  Broadrick v. Oklahoma, 413 U.S. at 612 (quoting Dombrowski v. Pfister, 380 U.S. 479, 486 (1965)).

The fact that, because Munson is not a charity, there might not be a possibility that the challenged statute could restrict Munson's own First Amendment rights does not alter the analysis.  Facial challenges to overly broad statutes are allowed not primarily for the benefit of the litigant, but for the benefit of society -- to prevent the statute from chilling the First Amendment rights of other parties not before the court.  Munson's ability to serve that function has nothing to do with whether or not its own First Amendment rights are at stake. The crucial issues are whether Munson satisfies the requirement of "injury-in-fact," and whether it can be expected satisfactorily to frame the issues in the case. If so, there is no reason that Munson need also be a charity.  If not, Munson could not bring this challenge even if it were a charity.

The Secretary concedes that the Art. III case-or-controversy requirement has been met and the Secretary has come forward with no reason why Munson is an inadequate advocate to assert the charities' rights.  The activity sought to be protected is at the heart of the business relationship between Munson and its clients, and Munson's interests in challenging the statute are completely consistent with the First Amendment interests of the charities it represents.  We see no prudential reason not to allow it to challenge the statute

Sec'y of State of Md. v. Joseph H. Munson Co., Inc., 467 U.S. at 957-58 (citations omitted).

## LAW REGARDING FIRST AMENDMENT STANDARDS ON GOVERNMENT PROPERTY

The Supreme Court "has adopted a forum analysis as a means of determining when the

Government's interest in limiting the use of its property to its intended purpose outweighs the

interest of those wishing to use the property for other purposes."  United States v. Kokinda, 497

U.S. 720, 726 (1990).

Regulation of speech activity on governmental property that has been traditionally open to the public for expressive activity, such as public streets and parks, is examined under strict scrutiny.  Regulation of speech on property that the Government has expressly dedicated to speech activity is also examined under strict scrutiny.  But regulation of speech activity where the Government has not dedicated its property to First Amendment activity is examined only for reasonableness.

United States v. Kokinda 497 U.S. at 726-27 (citing Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. at 45-46)(internal citations omitted).

### 1.    The Tripartite Framework.

In analyzing the constitutionality of restrictions on speech that occurs on public property, the Supreme Court has "identified three types of forums: the traditional public forum, the public forum created by government designation, and the nonpublic forum." Cornelius v. NAACP Legal Defense & Educ. Fund, Inc., 473 U.S. 788, 802 (1985).   The Supreme Court has determined that this tripartite framework is necessary, because "[t]he First Amendment does not guarantee access to property simply because it is owned or controlled by the government." Cornelius v. NAACP Legal Defense & Educ. Fund, Inc., 473 U.S. at 803.   The Supreme Court has explained that "the State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. at 46 (quoting U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns, 453 U.S. 114, 129-30 (1981)).

### a.    Traditional Public Forums.

"Traditional public fora are defined by the objective characteristics of the property, such as whether, 'by long tradition or by government fiat,' the property has been 'devoted to assembly and debate.'" Ark. Educ. Television Comm'n v. Forbes, 523 U.S. 666, 677 (quoting Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45 (1983)).   "The government can exclude a speaker from a traditional public forum 'only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest.'" Ark. Educ. Television Comm'n v. Forbes, 523 U.S. at 677 (quoting Cornelius v. NAACP Legal Defense & Educ. Fund, Inc., 473 U.S. at 800).   The classic examples of traditional public forums

are parks, sidewalks, and streets.  See Smolla, supra, § 8:4; Chemerinsky, supra, § 11.4.2.5, at 1143-44.  The Supreme Court has defined this category rather narrowly, and its extensive focus on the forum's historical pedigree as a location of free speech makes it unlikely that this category will grow to include new locations in the foreseeable future.  See Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 680 (1992)("[G]iven the lateness with which the modern air terminal has made its appearance, it hardly qualifies for the description of having 'immemorially . . . time out of mind' been held in the public trust and used for purposes of expressive activity."  (omission in original)(quoting Hague v. Comm. for Indus. Org., 307 U.S. 496, 515 (1939))); Chemerinsky, supra, § 11.4.2.5, at 1143 (noting that the Supreme Court's refusal to find that airports had the requisite history -- despite being "decades old" at the time of the case -- indicates that the Supreme Court has outlined a "narrow focus [which] makes it difficult to find that a place is a public forum based on a tradition of openness to speech").

> **b.      Designated Public Forums.**

"Designated public fora . . . are created by purposeful governmental action."  Ark. Educ. Television Comm'n v. Forbes, 523 U.S. at 677.  "The government does not create a [designated] public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional public forum for public discourse."  Cornelius v. NAACP Legal Defense & Educ. Fund, Inc., 473 U.S. at 802.  Accord Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 678 (1992)(stating that a designated public forum is "property that the State has opened for expressive activity by part or all of the public").  The Supreme Court looks to the "policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum."  Cornelius v. NAACP Legal Defense & Educ. Fund, Inc., 473 U.S. at 802.  "If the government excludes a speaker who falls within the class to

- 31 -

which a designated public forum is made generally available, its action is subject to strict scrutiny." Ark. Educ. Television Comm'n v. Forbes, 523 U.S. at 677.

c.      **Nonpublic (or Limited Public) Forums.**

"Other government properties are either nonpublic fora or not fora at all." Ark. Educ. Television Comm'n v. Forbes, 523 U.S. at 655 (citing Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. at 678-79). Nonpublic forums are sometimes referred to as limited public forums. Governmental restrictions on access to a nonpublic forum are valid so long as "the restrictions are reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." Cornelius v. NAACP Legal Defense & Educ. Fund, Inc., 473 U.S. at 800.

> With respect to activities on government property, the Constitution does not require "the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities."

Ramos v. Carbajal, 508 F. Supp. 2d 905, 913 (D.N.M. 2007)(Browning, J.)(quoting Cornelius v. NAACP Legal Defense & Educ. Fund, Inc., 473 U.S. at 799-800).

The Supreme Court determined in International Society for Krishna Consciousness, Inc. v. Lee that airport terminals are nonpublic forums, and the government could thus impose reasonable, viewpoint-neutral, speech restrictions. See 505 U.S. at 679-83. In reaching this decision, the Supreme Court found that the "tradition of airport activity does not demonstrate that airports have historically been made available for speech activity." 505 U.S. at 680-81. The Supreme Court noted that, "given the lateness with which the modern air terminal has made its appearance, it hardly qualifies for the description of having 'immemorially . . . time out of mind' been held in the public trust and used for purposes of expressive activity." 505 U.S. at 680

- 32 -

(quoting Hague Comm. for Indus. Org., 307 U.S. 496, 515 (1939)).  The Supreme Court stated that, given the "rather short history of air transport," various religious and non-profit organizations had come to use commercial airport terminals only in recent years as a "forum for the distribution of literature, solicitation of funds, the proselytizing of new members, and other similar activity," the conduct at issue in the case.  Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. at 680.  The Supreme Court also noted that airport terminals are unlike other "transportation nodes," which the plaintiffs asserted are forums in which free speech is historically protected, because airport terminals are public locations, which include security checkpoints, and because the Federal Aviation Administration "not infrequently" restricts public access to airport terminals.  505 U.S. at 681.

The Supreme Court further noted that airport terminals, the primary purpose of which is to "provide services attractive to the marketplace," are not forums which have a principal purpose of promoting the "'free exchange of ideas.'"  505 U.S. at 682 (quoting Cornelius v. NAACP Legal Defense & Educ. Fund, Inc., 473 U.S. at 800).  The Supreme Court noted that the purpose of airport terminals is "passenger air travel, not the promotion of expression," with an emphasis on efficient air travel.  Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. at 681.  On this basis, the Supreme Court found that "neither by tradition nor purpose can the terminals be described as satisfying the standards we have previously set out for identifying a public forum."  505 U.S. at 681.

Regarding speech restrictions in a nonpublic forum, the Supreme Court emphasized in International Society for Krishna Consciousness, Inc. v. Lee that the "restriction need only be reasonable; it need not be the most reasonable or the only reasonable limitation."  505 U.S. at 683 (emphasis in original)(citation omitted).  Before the Supreme Court was an airport's

prohibition on solicitation within the terminal.  The Supreme Court found that the prohibition was reasonable, noting that solicitation often has a "disruptive effect . . . on business."  505 U.S. at 683.  The prohibition also kept passengers from having to alter their paths within the terminal to avoid solicitors, which could cause congestion and inefficiency, and be costly to the airport and passengers therein, "as a flight missed by only a few minutes can result in hours' worth of subsequent inconvenience."  505 U.S. at 683-84.  The Supreme Court also noted that passengers in an airport are often on tight schedules and may not complain about inappropriate solicitation out of a desire to catch their flight.  Additionally, the airport had allowed solicitors to continue their activities on the sidewalk outside the terminals, an area frequented by the general public, and thus the solicitors were not completely cut off from reaching airport passengers.  See 505 U.S. at 684-85.

In sum, the Supreme Court in International Society for Krishna Consciousness, Inc. v. Lee stated that the "inconveniences to passengers and the burden on the [airport] officials flowing from solicitation activity may seem small, but viewed against the fact that pedestrian congestion is one of the greatest problems facing the three terminals, . . . the [airport] could reasonably worry that even such incremental effects would prove quite disruptive."  505 U.S. at 685.  The Supreme Court also noted that, if every group of solicitors were allowed inside the terminal, as the airport would be required to permit so as to remain viewpoint neutral, the concern regarding congestion and crowd control would only be accentuated.  The Supreme Court thus concluded that the airport's ban on all solicitation within the terminal was a reasonable and viewpoint-neutral speech restriction.  See 505 U.S. at 685.

2.    **Reasonable Time, Place, or Manner Restrictions.**

Regardless of the forum involved, the government may impose time, place, or manner restrictions on speech that takes place on government property, provided that the restrictions are: (i) reasonable; (ii) content-neutral, both as to subject matter and viewpoint; (iii) aimed at serving a "significant governmental interest"; (iv) narrowly tailored to effectuate that interest; and (v) crafted in a way that "leaves open ample alternative channels of communication."[12]  Heffron v. Int'l Soc'y for Krishna Consciousness, Inc., 452 U.S. at 648; Ward v. Rock Against Racism, 491 U.S. 781, 798-99, 802 (1989).  "Such regulations do not regulate *what* is said, but merely such matters as *when*, *where*, and *how loud*."  Smolla, supra, § 8:36 (emphasis in original).

---

[12]The conclusion that a speech restriction is a time, place, or manner restriction results in reducing the level of judicial scrutiny if the forum involved is a traditional public forum or designated public forum -- where speech restrictions are normally subject to strict scrutiny.  In limited public forums, however, speech restrictions -- even content-based ones -- are subject only to the requirements of reasonableness and viewpoint-neutrality.  The question, then, is what standard applies to a time, place, or manner restriction on a limited public forum.  There are two possible conclusions: (i) time, place, or manner restrictions are subject to a higher level of scrutiny than content-based restrictions, which are not required to be narrowly tailored around a significant government interest; or (ii) time, place, or manner restrictions are subject to the same standards as content-based restrictions, and thus need only be reasonable and viewpoint-neutral.  The Court concludes that the first option is inconsistent with the Supreme Court's purpose in carving out a special doctrine for time, place, or manner restrictions.  Such restrictions regulate less important aspects of speech than its content, and are more likely to be justified by legitimate government interests.  The Court can also conceive of no reason that time, place, or manner restrictions would be held to a lower level of scrutiny than content-based restrictions in some forums, but held to a higher level of scrutiny in others.  The Court thus concludes that time, place, or manner doctrine is inapplicable -- or, rather, it does no work -- in the context of limited public forums, nonpublic forums, and nonforums.

The Honorable John Paul Stevens, Associate Justice of the Supreme Court, observed that, when lawyers argue before the Supreme Court, counsel for the appellant argues before counsel for the appellee, and both parties must adhere to a strict time limit.  See Consol. Edison Co. v. Pub. Serv. Comm'n, 447 U.S. 530, 545 (1980)(Stevens, J., concurring).  Although these restrictions -- and many other Supreme Court procedural rules -- seem to be time, place, or manner restrictions, they do not need to be narrowly tailored around a significant government interest.  See 447 U.S. at 545; Smolla, supra, § 8:44.  The courtroom's status as a nonforum supplies the relevant analytical framework -- not the time, place, or manner doctrine.  See Smolla, supra, § 8:44.

The Tenth Circuit has held that significant government interests "include public safety, accommodating competing uses . . . , controlling the level and times of noise, and similar interests." First Unitarian Church of Salt Lake City v. Salt Lake City Corp., 308 F.3d 1114, 1132 (10th Cir. 2002). Once the interest is identified, the government must show that the restriction is narrowly tailored to serve that interest. The requirement of narrow tailoring does not, however, mean that the government must adopt the least restrictive alternative for achieving its asserted interest. See Ward v. Rock Against Racism, 491 U.S. at 789-99. It merely means that the speech restriction must not go so far that a less extensive restriction would effectuate the interest just as well:

> [A] regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but that it need not be the least restrictive or least intrusive means of doing so. Rather, the requirement of narrow tailoring is satisfied "so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." United States v. Albertini, 472 U.S. 675, 689 (1985). To be sure, this standard does not mean that a time, place, or manner regulation may burden substantially more speech than is necessary to further the government's legitimate interests. Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals. See Frisby v. Schultz, 487 U.S. 474, 485 (1988)("A complete ban can be narrowly tailored but only if each activity within the proscription's scope is an appropriately targeted evil."). So long as the means chosen are not substantially broader than necessary to achieve the government's interest, however, the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative. "The validity of [time, place, or manner] regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests" or the degree to which those interests should be promoted. United States v. Albertini, 472 U.S. at 689.

Ward v. Rock Against Racism, 491 U.S. at 798-800 (citations omitted). That case upheld a municipal guideline requiring all musical acts performing at a city park to use a sound system

- 36 -

and technician that the city provided, so as to reduce the noise level in the surrounding residential areas.  See 491 U.S. at 800-01.

## LAW REGARDING VOID-FOR-VAGUENESS DOCTRINE

"Facial invalidation is, manifestly, strong medicine that has been employed by the Court sparingly and only as a last resort."  Nat'l Endowment for the Arts v. Finley, 524 U.S. 569, 580 (1998)(internal quotation marks omitted).  "Vagueness doctrine is an outgrowth not of the First Amendment, but of the Due Process Clause of the Fifth Amendment."  United States v. Williams, 553 U.S. 285, 304 (2008).  "A statute can be impermissibly vague for either of two independent reasons.  First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.  Second, if it authorizes or even encourages arbitrary and discriminatory enforcement."  Hill v. Colorado, 530 U.S. 703, 732 (2000)(citing Chicago v. Morales, 527 U.S. 41, 56-57 (1999)).  See United States v. Williams, 553 U.S. at 304 (describing a vague statute as failing "to provide a person of ordinary intelligence fair notice of what is prohibited, or [as being] so standardless that it authorizes or encourages seriously discriminatory enforcement.");  Mini Spas, Inc. v. South Salt Lake City Corp., 810 F.2d 939, 942 (10th Cir. 1987)("A statute violates due process if it is so vague that a person of common intelligence cannot discern what conduct is prohibited, required, or tolerated.").  "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is."  United States v. Williams, 553 U.S. at 306.  The Supreme Court has noted that "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity."  United States v. Williams, 553 U.S. at 304 (quoting Ward v. Rock Against Racism, 491 U.S. 781, 794 (1989)).

"A federal court evaluating a vagueness challenge to a state law must read the statute as it is interpreted by the state's highest court." United States v. Gaudreau, 860 F.2d 357, 361 (10th Cir. 1988)(citation omitted).   In evaluating the constitutional validity of state statutes, the Supreme Court has stated that "every possible presumption is to be indulged in favor of the validity of a statute." Mugler v. Kansas, 123 U.S. 623, 661 (1887).  The Supreme Court of New Mexico, in discussing the presumption of constitutional validity that attaches to acts of the New Mexico legislature, has stated:

> A strong presumption of constitutionality underlies each legislative enactment, and we will not void a statute where a constitutional construction is reasonably supported by the statutory language.  In construing a regulation or statute, "this Court has a duty to affirm the legislation's validity and constitutionality if reasonably possible." Old Abe Co. v. N.M. Mining Comm'n, 1995-NMCA-134, ¶ 43, 908 P.2d 776, 789-90.  A statute is only unconstitutional "if it is so vague that persons of common intelligence must guess at its meaning and would differ in its application." City of Albuquerque v. Sanchez, 1992-NMCA-038, ¶ 21, 832 P.2d 412, 418.   However, "absolute or mathematical certainty is not required in the framing of a statute." State ex rel. Bliss v. Dority, 1950-NMSC-066, ¶ 35, 225 P.2d 1007, 1017.

Bishop v. Evangelical Good Samaritan Soc'y, 2009-NMSC-036, ¶ 20, 212 P.3d 361, 366-67 (citations omitted).  In some cases, however, the Supreme Court of the United States has noted that it could not remedy a constitutionally imprecise state statute.  See Hynes v. Mayor & Council of Oradell, 425 U.S. 610, 622 (1976)("Even assuming that a more explicit limiting interpretation of the ordinance could remedy the flaws we have pointed out -- a matter on which we intimate no view -- we are without power to remedy the defects by giving the ordinance constitutionally precise content.").

In determining whether a federal statute is unconstitutionally vague, the Supreme Court has also noted that a strong presumption of validity attaches to Congress' enactments and has consistently construed a challenged statute narrowly rather than condemn it as unconstitutionally

vague.  See Skilling v. United States, 561 U.S. 358, 405 (2010)("It has long been our practice, however, before striking a federal statute as impermissibly vague, to consider whether the prescription is amenable to a limiting construction."); United States v. Nat'l Dairy Prods. Corp., 372 U.S. 29, 32 (1963)(stressing, in response to a vagueness challenge, "[t]he strong presumptive validity that attaches to an Act of Congress").  In Skilling v. United States, the Supreme Court looked to Congress' intent in passing the honest-services doctrine, and limited the construction of the honest-services doctrine to reach bribes and kickbacks, as Congress intended, stating:

> [T]here is no doubt that Congress intended § 1346 to reach at *least* bribes and kickbacks.  Reading the statute to proscribe a wider range of offensive conduct, we acknowledge, would raise the due process concerns underlying the vagueness doctrine. To preserve the statute without transgressing constitutional limitations, we now hold that § 1346 criminalizes only the bribe-and-kickback core of the pre-*McNally* [*v. United States*, 483 U.S. 350 (1987), a case that rejected lower courts' expansion of § 1346 to criminalize a broad and nebulous umbrella of conduct] case law.
>
> . . . .
>
> Justice SCALIA charges that our construction of § 1346 is "not interpretation but invention."  Skilling v. United States, 561 U.S. at 422 (Scalia, J., dissenting, joined by Thomas & Kennedy, JJ.).  Stating that he "know[s] of no precedent for . . . 'paring down'" the pre-*McNally* case law to its core, he contends that the Court today "wield[s] a power we long ago abjured: the power to define new federal crimes."  As noted, cases "paring down" federal statutes to avoid constitutional shoals are legion.  These cases recognize that the Court does not legislate, but instead respects the legislature, by preserving a statute through a limiting interpretation.  See United States v. Lanier, 520 U.S. 259, 267-268, n.6 (1997)(This Court does not "create a common law crime" by adopting a "narrow[ing] constru[ction]."  (internal quotation marks omitted)). Given that the Courts of Appeals uniformly recognized bribery and kickback schemes as honest-services fraud before *McNally*, and that these schemes composed the lion's share of honest-services cases, limiting § 1346 to these heartland applications is surely "fairly possible."  Boos v. Barry, 485 U.S. 312, 331 (1988).  Cf. Clark v. Martinez, 543 U.S. 371, 380 (2005)(Scalia, J.)(when adopting a limiting construction, "[t]he lowest common denominator, as it were, must govern").  So construed, the statute is not unconstitutionally vague.  Only by taking a wrecking ball to a statute that can be salvaged through a reasonable narrowing interpretation would we act out of step with precedent.

Skilling v. United States, 130 S. Ct. at 2931 & n.43 (emphasis in original)(footnotes omitted)(citations omitted).

In Grayned v. City of Rockford, 408 U.S. 104 (1972), the Supreme Court stated that, when assessing whether a statute is vague, it looks to "the words of the ordinance itself, to the interpretations the court below has given to analogous statutes, and, perhaps to some degree, to the interpretation of the statute given by those charged with enforcing it."  408 U.S. at 110 (internal quotation marks omitted).  For example, in Minority TV Project Inc. v. FCC, No. C-06-02699 EDL, 2007 WL 4570293 (N.D. Cal. Dec. 21, 2007), the Honorable Elizabeth D. Laporte, United States District Judge for the Northern District of California, found it premature to dismiss a facial challenge of void for vagueness until the plaintiffs introduced evidence of the Federal Communication Commission's enforcement decisions applying the statute in question -- a prohibition against certain paid promotional advertisements.  See 2007 WL 4570293, at *12. When the plaintiffs submitted evidence of the FCC's enforcement, Judge Laporte found the statute was not unconstitutionally vague, explaining:

> Assuming that the Court may "perhaps to some degree" consider the FCC's interpretation of the statute in evaluating whether the statute is vague, Grayned v. City of Rockford, 408 U.S. 104, 110 (1972), as Plaintiff urges the Court to do, arguable inconsistencies in a statute's application in a handful of cases do not condemn a statute.  If such limited inconsistencies rendered statutes unconstitutionally vague, the majority of statutes would probably not survive a vagueness challenge.  Rather, "uncertainty at a statute's margins will not warrant facial invalidation if it is clear what the statute proscribes 'in the vast majority of its intended applications.'"  California Teachers Ass'n, 271 F.3d at 1151 (quoting Hill v. Colorado, 530 U.S. 703, 733 (2000)(rejecting vagueness challenge)(internal quotation marks omitted)).  As in Grayned, the words of the statute here are marked by "flexibility and reasonable breadth, rather than meticulous specificity," and "it is clear what the ordinance as a whole prohibits."  408 U.S. at 110 (quoting Esteban v. Central Missouri State College, 415 F.2d 1077, 1088 (8th Cir. 1969)).

Minority TV Project Inc. v. FCC, 649 F. Supp. 2d 1025, 1047 (N.D. Cal. 2009).  The Supreme Court in Grayned v. City of Rockford noted: "Condemned to the use of words, we can never expect mathematical certainty from our language."   408 U.S. at 110.   The Supreme Court rejected a facial vagueness challenge to an ordinance that implicated First Amendment rights, and prohibited certain demonstrations "adjacent" to schools that "disturb[] or tend[] to disturb the peace or good order of such school session or class thereof," finding that it was "clear what the ordinance as a whole prohibits," even though the statute at issue did not specify the prohibited quantum of disturbance.  408 U.S. at 109-11 ("Although the prohibited quantum of disturbance is not specified in the ordinance, it is apparent from the statute's announced purpose that the measure is whether normal school activity has been or is about to be disrupted.").

Numerous statutes have withstood facial vagueness challenges even though they contained arguably ambiguous language.  See, e.g., Hill v. Colorado, 530 U.S. at 732 (rejecting vagueness challenge to ordinance making it a crime to "approach" another person, without that person's "consent," to engage in "oral protest, education, or counseling" within specified distance of health-care facility); Boos v. Barry, 485 U.S. 312, 332 (1988)(rejecting vagueness challenge to ordinance interpreted as regulating conduct near foreign embassies "when the police reasonably believe that a threat to the security or peace of the embassy is present"); Cameron v. Johnson, 390 U.S. 611, 616 (1968)(rejecting vagueness challenge to ordinance prohibiting protests that "unreasonably interfere" with access to public buildings); Kovacs v. Cooper, 336 U.S. 77, 79 (1949)(rejecting vagueness challenge to sound ordinance forbidding "loud and raucous" sound amplification); Am. Ass'n of People with Disabilities v. Herrera, 580 F. Supp. 2d 1195, 1241 (D.N.M. 2008)(Browning, J.)(upholding New Mexico's regulation of

third-party voter-registration drives against a void-for-vagueness challenge), <u>reconsidered and</u> <u>upheld by</u> 2010 WL 3834049, at *8-14 (2010).

The void-for-vagueness doctrine operates in much reduced force outside of its core area of application, criminal law.  "To find a civil statute void for vagueness, the statute must be 'so vague and indefinite as really to be no rule or standard at all.'"  <u>Seniors Civil Liberties Ass'n,</u> <u>Inc. v. Kemp</u>, 965 F.2d 1030, 1036 (11th Cir. 1992)(per curiam)(quoting <u>Boutilier v. INS</u>, 387 U.S. 118, 123 (1967)).  The Honorable Ira DeMent, United States District Judge for the Middle District of Alabama, wrote:

> The void-for-vagueness doctrine applies in civil cases as well as criminal ones.  <u>See</u>, <u>e.g.</u>, <u>Gentile v. State Bar of Nev.</u>, 501 U.S. 1030, 1048-51 (1991)(holding that attorney disciplinary rule was unconstitutionally vague as applied); <u>Arnett v. Kennedy</u>, 416 U.S. 134, 159-64 (1974)(plurality)(holding employment protection standard not impermissibly vague in regulating speech of federal employees); 416 U.S. at 164 (Powell, J., concurring in part and concurring in result in part)(agreeing with plurality on this issue); <u>Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers</u>, 413 U.S. 548, 576-79 (1973)(considering void-for-vagueness challenge to restriction on government employee speech, though concluding that rule was not impermissibly vague); <u>Keyishian v. Bd. of Regents</u>, 385 U.S. 589, 603-04 (1967)(holding that restriction on government employee speech was unconstitutionally vague).
>
> "To find a civil statute void for vagueness, the statute must be so vague and indefinite as really to be no rule or standard at all." <u>Boutilier v. INS</u>, 387 U.S. 118, 123 (1967).  Plaintiffs try to overcome this civil-statute standard by arguing that the Act imposes quasi-criminal penalties.  But "even if construed as a penal statute, a non-criminal statute is not unconstitutionally vague 'if persons of reasonable intelligence can derive a core meaning from the statute.'"  <u>Cotton States Mutual Ins. Co. v. Anderson</u>, 749 F.2d 663, 669 n.9 (11th Cir. 1984).

<u>Smith v. Campbell</u>, No. CIV 03-0973 ID/WO, 2006 WL 2597837, at *2-3 (M.D. Ala. Sept. 11, 2006)(DeMent, J.)(citing <u>Seniors Civil Liberties Ass'n, Inc. v. Kemp</u>, 965 F.2d at 1036).

## ANALYSIS

The Court has carefully reviewed: (i) all pleadings and attached documents, consisting of the Complaint, the Ruidoso Defendants' Answer to Complaint for Violation of Civil Rights,

Damages and for Declaratory and Injunctive Relief, filed October 10, 2013 (Doc. 14), and Defendant Daniel A. Bryant's Answer to Complaint for Violation of Civil Rights, Damages and for Declaratory and Injunctive Relief, filed October 10, 2013 (Doc. 15); (ii) all briefing submitted to Judge Wormuth on the motion, consisting of the MSJ, Griffin's Response to the Motion for Summary Judgment, filed October 28, 2013 (Doc. 17), and the Ruidoso Defendants' Reply in Support of Motion for Summary Judgment, filed November 11, 2013 (Doc. 19); (iii) the PFRD; and (iv) both parties' Objections to the PFRD.  Griffin's Complaint asserts the following claims: violation of his First Amendment rights when the Governing Body[13] refused to place him on the official agenda or allow him to speak during the agenda portion of Governing Body meetings; civil conspiracy to violate his First Amendment rights; declarations that the Resolution governing public meetings is partly void for vagueness and partly void as censorship; and mandatory and prohibitory injunctions regarding speech during Governing Body meetings.  See Complaint ¶¶ 73-85, at 15-16; id. ¶¶ 86-91, at 17; id. ¶¶ 101-102, at 19; id. ¶¶ 92-100, at 18-19; id. ¶¶ 98-100, at 18-19.  As to Count 1, the Court agrees with Judge Wormuth that, because Griffin was not prevented from speaking at the Governing Body meeting, the Governing Body's failure to put him on the agenda did not violate his First Amendment rights.  As to Count 2, Griffin fails to demonstrate the existence of a civil conspiracy.  Count 3 fails as to Section 1 of the Resolution, because Section 1 is not unconstitutionally overbroad or vague, and succeeds as to Section 5, because the "no negative mention" restriction is an unconstitutional burden on speech.  Finally, the Court accepts Judge Wormuth's recommendation to deny Count 4 as to the

---

[13]The "Governing Body" refers to the Village Council; the Resolutions use the former term, and so will the Court.  See MSJ ¶ 1, at 3 (setting forth the interchangeability of the terms as an undisputed material fact).  The Governing Body is composed of the Mayor of Ruidoso and six Councilors.  See Village Council, Ruidoso New Mexico: Living in Nature's Playground, http://ruidoso-nm.gov/village-council.html.

request made in ¶ 102a, but declines to adopt Judge Wormuth's recommendation about injunctive relief and grants Griffin's requested injunctive relief in ¶ 102b, enjoining the Governing Body from enforcing Section 5Ff in its current form.

## I.    THE COURT OVERRULES THE DEFENDANTS' SOLE OBJECTION, WHICH RELATES TO JUDGE WORMUTH'S RECOMMENDATION FOR DECLARATORY RELIEF REGARDING THE "NO NEGATIVE MENTION" PROVISION IN THE GOVERNING BODY RESOLUTIONS.

The Defendants' sole objection to Judge Wormuth's PFRD is to contest the proposed finding that Section 5Ff,[14] which forbids speakers from making "any negative mention . . . of any Village personnel, staff, or of the Governing Body" during the public input portion of Governing Body meetings, is a unconstitutional speech restriction.  See Defendants' Objections at 1-2. Instead, they contend that it is a content-neutral time, place, or manner restriction designed to prevent disruption during Governing Body meetings.  See Defendants' Objections at 2.  In support of their argument, they cite Lowery v. Jefferson County Board of Education, 586 F.3d 427, 433 (6th Cir. 2009), in which the Sixth Circuit found that the following restrictions were content-neutral: "[T]he director of schools shall take appropriate steps to determine that appeals or appearances before the board are not frivolous, repetitive, nor harassing in nature," and "[t]he chairman shall have the authority to terminate the remarks of any individual who does not adhere

---

[14]The Court will use "Section 5Ff" to refer to the provision -- numbered Section 5Ff in Resolution 2012-16, and Section 5Ic and Section 5Kc in earlier Resolutions -- that provides that "no negative mention" shall be made of certain government employees and -- as amended in the final Resolution (2012-16) -- the Governing Body.  See Village of Ruidoso Resolution 2011-02 at 5, filed October 14, 2013 (Doc. 16-2)(numbering the provision Section 5Ic); Village of Ruidoso Resolution 2011-27 at 6, filed October 14, 2013 (Doc. 16-3)(numbering the provision Section 5Kc); Village of Ruidoso Resolution 2012-09 at 6, filed October 14, 2013 (Doc. 16-4)(numbering the provision Section 5Kc); Village of Ruidoso Resolution 2012-16 at 4-5, filed October 14, 2013 (Doc. 16-5)(numbering the provision Section 5Ff, and adding "the Governing Body" to the list of people and entities about whom and which negative mention may not be made).  The Court's declaration that the Resolutions are constitutionally defective is limited to Section 5Ff.

to the above rules and/or chooses to be abusive to an individual board member or the Board as a whole."   586 F.3d at 433.   They also heavily rely on <u>Scroggins v. City of Topeka, Kan.</u>, 2 F. Supp. 2d 1362 (D. Kan. 2007), in which a district judge within the Tenth Circuit upheld a city council meeting provision providing that "[a]ny person making personal, rude, or slanderous remarks, or who becomes boisterous, while addressing the Council shall be requested to leave the meeting . . . ."  2 F. Supp. 2d at 1366.

The Court will grant Griffin's request for a declaratory judgment that Section 5Ff is unconstitutional, <u>see</u> Complaint ¶¶ 98-100, at 18-19, and his request for injunctive relief "[p]rohibiting the Village of Ruidoso from enforcing the public ban against negative mention of Village personnel, staff or the governing body," Complaint ¶ 102b, at 19.  The Court agrees with Judge Wormuth's result and, generally, with his reasoning, <u>see</u> PFRD at 22-27, but will analyze the issue separately to clarify several points.   Judge Wormuth states that "[t]he 'negative mention' provision of Section 5Ff may be an unconstitutional prior restraint on speech."  PFRD at 22 (emphasis omitted).  He declines to decide what type of First Amendment forum the public input portion of the meeting is, <u>see</u> PFRD at 13-15, 24 n.11, forgoing this step of the analysis "because [he] find[s] that the restriction at issue here is content-based, [and thus] the type of forum is irrelevant."  PFRD at 24 n.11.  Judge Wormuth comes to the conclusion that Section 5Ff is content-based without much analysis, stating only: "[I]t is precisely *because* the content of the speech is 'negative' with regards to the Village personnel, staff, or the Governing Body that it is regulated."  PFRD at 24 (emphasis in original)(citations omitted).  Once he finds that the restriction is content-based, Judge Wormuth applies strict scrutiny, finding that -- unlike the City of Topeka's rule that "[a]ny person making personal, rude, or slanderous remarks . . . while addressing the Council shall be requested to leave the meeting and may be at once

barred . . . from further audience before the Council," Scroggins v. City of Topeka, Kan., 2 F. Supp. 2d at 1366 -- Section 5's restriction on "negative mention" of government employees is not sufficiently narrowly tailored.  Judge Wormuth does not engage in a threshold standing analysis or a First Amendment overbreadth analysis, and concludes that the void-for-vagueness doctrine does not apply, because "there is no civil or criminal punishment for . . . failing to comply with the procedure."  PFRD at 22.  Last, Judge Wormuth recommends refusal of injunctive relief, even relating to Section 5Ff, because Griffin has not demonstrated that he would suffer irreparable harm and, "should this court enter a declaratory judgment that this portion of the Resolution is unconstitutional, Plaintiff would receive an adequate legal remedy." PFRD at 28.

The Court will approach the analysis somewhat differently.  First, the Court concludes that Section 5Ff is not void for vagueness under the Due Process Clause.  The Court agrees with Judge Wormuth that the void-for-vagueness doctrine does not apply in full force to an ordinance such as this one, where the only penalty for noncompliance is the loss of speaking rights at a meeting.  Second, the Court concludes that Griffin has standing to challenge Section 5Ff's constitutionality.  Even though Griffin was neither restrained from nor punished for violating Section 5Ff, he has standing under First Amendment overbreadth principles, because the Court concludes that he suffered an injury in fact under the meaning of the Case or Controversy Clause, and prudential standing is presumed satisfied in First Amendment challenges.  Third, beginning the substantive First Amendment analysis, the Court concludes that Section 5Ff is not a prior restraint, but rather a rule that provides for subsequent punishment.  That Griffin may have been chilled from engaging in constitutionally protected speech by the threat of being cut off does not change the analysis.  Last, the Court determines that even though Section 5Ff is not

a prior restraint, it violates the First Amendment. The Governing Body meetings are limited public forums, and, as such, any speech restrictions need only be reasonable and viewpoint-neutral, but not necessarily content-neutral. The Court concludes, however, that Section 5Ff is viewpoint-based, because its prohibition against "negative mention . . . of any Village personnel, staff or the Governing Body," permits praise and neutral feedback, but not criticism, of both government employees and, worse, the Governing Body itself. The Court further concludes that strict scrutiny, not substantial overbreadth, is the relevant substantive standard to apply to viewpoint-based speech restrictions and that Section 5Ff fails strict scrutiny. Because the Court has no basis in law or in fact for construing Section 5Ff narrowly to save its constitutionality, it will strike it down the rule as unconstitutional.

> A.   **THE VOID-FOR-VAGUENESS DOCTRINE DOES NOT APPLY TO SECTION 5Ff, BECAUSE SECTION 5Ff IS NOT A CRIMINAL PROVISION AND IT PROVIDES AN INTELLIGIBLE STANDARD OF CONDUCT.**

The Court agrees with Judge Wormuth's void-for-vagueness analysis. The void-for-vagueness doctrine is primarily a criminal doctrine. See Skilling v. United States, 561 U.S. at 402-03 ("To satisfy due process, 'a penal statute [must] define the criminal offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement.' The void-for-vagueness doctrine embraces these requirements." (quoting Kolender v. Lawson, 461 U.S. 352, 357 (1983))); United States v. Corrow, 119 F.3d 796, 802 (10th Cir. 1997)("[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." (citations omitted)(internal quotation marks omitted)); Smolla, supra, § 6:13 ("The practice of striking down a law because it

is 'void for vagueness' is not unique to First Amendment jurisprudence, but rather is a general principle of constitutional and criminal law.").  "To find a civil statute void for vagueness, the statute must be 'so vague and indefinite as really to be no rule or standard at all.'"  Seniors Civil Liberties Ass'n, Inc. v. Kemp, 965 F.2d at 1036 (quoting Boutilier v. INS, 387 U.S. at 123).

Non-penal statutes are often vague and are not struck down as void for vagueness.  For example, many statutes -- as well as ordinary negligence law -- hold people to the standard of a "reasonable person," which is at least as vague as the criminal ordinances the Supreme Court struck down in Coates v. Cincinnati, 402 U.S. 611 (1971), which criminalized "three or more persons . . . assembl[ing] . . . on any of the sidewalks . . . and there conduct themselves in a manner annoying to persons passing by," 402 U.S. at 611, and in Cox v. Louisiana, 379 U.S. 536 (1965), which criminalized breaching the peace -- defined as "to agitate, to arouse from a state of repose, to molest, to interrupt, to hinder, to disquiet," 379 U.S. at 551.  Negligence law would, thus, fail the void-for-vagueness analysis that applies to criminal statutes,[15] but tort law -- despite providing for sometimes extensive monetary penalties -- is not subject to that standard.  Civil provisions need provide only "intelligible benchmark[s]" to survive a void-for-vagueness challenge.  K-S Pharmacies, Inc. v. Am. Home Prods. Corp., 962 F.2d 728, 732 (7th Cir. 1992)(Easterbrook, J.).  As the Honorable Frank H. Easterbrook, United States Circuit Judge for the Court of Appeals for the Seventh Circuit, wrote, analyzing a Wisconsin price discrimination law:

> Is Wisconsin's law vague?  Of course it is.  No statute so compact as
> § 100.31(2) resolves a fraction of the problems that attend any attempt to regulate

---

[15]That negligence is a creature of the common law and not contained in a statute at all only solidifies this analysis.  An ordinary person is more likely to be put on notice of what conduct the law proscribes and requires of them by a statute than by an amorphous body of common law.

price differences.  Weighty treatises on the Robinson-Patman Act attest to the many subtle issues that arise.  One open issue in particular excites AHPC and its supporting amicus: over what time?  Does § 100.31(2) ban different prices only in contemporaneous sales, or may sales months apart be matched?  Plaintiffs' complaint seeks redress for price differences in sales separated by six months.  If § 100.31(2) has such scope, AHPC observes, then it is unlawful for a firm to increase or reduce its prices, period.  Nothing in § 100.31(2) helps a court fix the temporal scope of the bar or resolve the other questions sure to arise.

Is Wisconsin's law *unconstitutionally* vague?  Of course it is not.  It is no worse than the Robinson-Patman Act itself, which resolves few of the many questions (including temporal scope) so vital to implementation.  If § 100.31(2) is unconstitutionally vague, then the entire common law is unconstitutional because courts revise this non-text as they go along, and all laws calling for "reasonable" behavior in one or another fashion are forbidden.  Yet for centuries courts have thought it sufficient that specificity may be created through the process of construction.  Clarity via interpretation is enough even when the law affects political speech, see Civil Service Comm'n v. Letter Carriers, 413 U.S. 548, 575-80 (1973)(upholding the Hatch Act), or defines crimes, see Parker v. Levy, 417 U.S. 733, 752-57 (1974)(upholding a provision of the Uniform Code of Military Justice punishing "conduct unbecoming an officer and a gentleman").  Section 100.31(2) sets an intelligible benchmark (no price discrimination) and leaves the details to be worked out.  Section 100.31(2) is no less precise than the Sherman Act, another law providing for treble damages in private actions and criminal punishment in public ones.  Long ago the Court deemed the Sherman Act sufficient, and it has never questioned that conclusion.  If the Sherman and Robinson-Patman Acts comport with the due process clause, so does § 100.31(2).  AHPC observes that the thousands of cases interpreting these rules provide information missing for § 100.31(2), but to every law there comes a first interpretation.  The Sherman Act was not unconstitutional in 1890, becoming enforceable only in 1913.  It has been constitutional all along because it provides a starting place, and courts resolve disputes as they arise.

K-S Pharmacies, Inc. v. Am. Home Prods. Corp., 962 F.2d at 732 (7th Cir. 1992)(emphasis in

original)(citations omitted).

The Court concludes that Section 5Ff clears the extremely low bar that the void-for-

vagueness doctrine sets for non-penal statutes.  It is not "so vague and indefinite as really to be

no rule or standard at all."   Boutilier v. INS, 387 U.S. at 123.  There are certainly some

hypothetical examples in which a reasonable person would not be able to determine whether his

or her speech fell inside or outside of Section 5Ff's ambit, e.g., a reference to a Governing Body

member being "always dead wrong about everything," but there are even more examples in which Section 5Ff's applicability or non-applicability would be clear, e.g., an announcement informing attendees of an upcoming civic event would fall clearly outside Section 5Ff's scope, and a profanity laced tirade about a government employee's obesity or perceived intelligence would fall clearly inside its scope. That clear examples can be found on both sides of the line illustrates that, while that line may be blurred at its edges, a line exists. Section 5Ff provides an intelligible benchmark regarding how to conduct oneself when speaking during the public input portion of the Governing Body meetings. There is no reason to apply more rigorous standards than those to Section 5Ff: it sets forth no criminal or monetary penalties; being sanctioned under the rule leaves no permanent "record" or lasting stigma; and the penalty that is meted out for its infraction is not even removal from the meeting, but being directed to cease talking. The Court concludes that Section 5Ff is not void for vagueness.

### B.   GRIFFIN HAS ARTICLE III STANDING AND STANDING UNDER THE OVERBREADTH DOCTRINE TO CHALLENGE SECTION 5.

Griffin has standing to challenge Section 5Ff's "negative mention" rule, even though he was never penalized for violating it, because: (i) the overbreadth doctrine relaxes the usual standing rules for challenges on First Amendment grounds; and (ii) although Griffin never violated or was penalized for violating Section 5Ff, he was subject to it, and it most likely affected his speech. "[W]here the claim is that a statute is overly broad in violation of the First Amendment, the Court has allowed a party to assert the rights of another . . . ." Sec'y of State of Md. v. Joseph H. Munson Co., Inc., 467 U.S. at 957.

Even though the usual prudential standing considerations are presumed satisfied in an overbreadth challenge, Griffin must still establish Article III standing for his case to be justiciable in federal court. Article III standing requires injury in fact, causation, and

- 50 -

redressability. See Lujan v. Defenders of Wildlife, 504 U.S. at 560-61. The Court concludes that Griffin clears the relatively low bar that the Case or Controversy Clause sets. An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." 504 U.S. at 560. The Court concludes that Griffin's injury was actual, because the speech he wanted to express at the Governing Body meetings -- which heavily implicated criticism of the Governing Body and its prior decisions and decision-making -- was restricted, even though he was not punished for it. This question would be closer if Griffin had filed this suit without ever attending a Governing Body meeting -- relying on the argument that Section 5Ff chilled him from attending, in that it was not worthwhile for him to attend and speak if he had to abide by it -- but, even then, he likely would come to the Court with an "imminent" injury in fact if he could establish that he intended to speak at the meetings but for Section 5Ff. Once the Court concludes that Griffin sustained an injury in fact, the rest of the Article III standing analysis is straightforward. When Griffin's injury in fact is styled as "the deprivation of his right to make negative mention of the government employees or the Governing Body," it is apparent that Section 5Ff is the fairly traceable cause of this injury. Last, the injury is redressable, because Section 5Ff has not been repealed and the case is thus not moot, and the invalidation of Section 5Ff will protect Griffin from recurring injury. Griffin has standing to challenge Section 5Ff.

### C. SECTION 5Ff'S "NEGATIVE MENTION" RULE IS NOT A PRIOR RESTRAINT ON SPEECH.

Section 5Ff is not a prior restraint on speech, but rather a rule that provides for subsequent punishment. That Griffin may have been chilled from engaging in constitutionally protected speech by the threat of the punishment -- which, here, is only that he would have been directed to quit speaking -- and was never subjected to subsequent punishment does not change

that conclusion.  When the government intervention comes only after the restricted speech has already been spoken, the restriction is not a prior restraint.  Had the Governing Body refused to allow Griffin to speak on the basis of their suspicion that he would violate Section 5Ff, see Village of Ruidoso Resolution 2012-16 at 5, filed October 14, 2013 (Doc. 16-5)(providing, in Section 5Fi, that presenters will be directed to discontinue speaking after violating the rules of Section 5F), then perhaps the analysis would be different, but, because the Governing Body applies the sanction that Section 5Fi contemplates, see Village of Ruidoso Resolution 2012-16 at 5 ("If any of the above guidelines are violated, the presenter will be declared out of order and will immediately cease continued comment."), only after it deems that the speaker has violated Section 5Ff, the sanction is not a prior restraint.

"In practice, most prior restraints involve either an administrative rule requiring some form of license or permit before one may engage in expression, or a judicial order directing an individual not to engage in expression, on pain of contempt."  Smolla, supra § 15:1.  Section 5Ff is obviously neither of these.  Moreover, the reason that prior restraint doctrine is generally confined to these two categories is because of the application of the collateral bar rule, and because the speaker's identity and message can be known in advance of the creation of the restraint.  The collateral bar rule has no application here; Griffin was not convicted of contempt of court, nor is he facing criminal or civil sanctions for refusal to honor a denial of a license.  It is also not the case that the Governing Body created the prior restraint with Griffin's specific identity or message in mind, in the way that an injunction is crafted or a license is denied only after consideration of an individual's identity and message.  Section 5Ff existed before Griffin began seeking the opportunity to comment at Governing Body meetings and was not an ad hoc creation in response to Griffin's desire to speak.

Although the Tenth Circuit has not addressed this question, see Shero v. City of Grove, Okla., 510 F.3d 1196, 1202 (10th Cir. 2007)(Kelly, J.)(upholding a three-minute speaking time restriction as a reasonable time, place, or manner restriction, and not addressing the contention that the restriction constituted a prior restraint), other courts that have analyzed speech restrictions on public comment in government meetings have reached the same conclusion, see Lowery v. Jefferson Cnty. Bd. of Educ., 586 F.3d at 434; Leventhal v. Vista Unified Sch. Dist., 973 F. Supp. 951, 961-62 (S.D. Cal. 1997)(Moskowitz, J.); Baca v. Moreno Valley Unified Sch. Dist., 936 F. Supp. 719, 727 (C.D. Cal. 1996)(Timlin, J.).   The Honorable Robert J. Timlin, United States District Judge for the Central District of California, addressed this issue most directly, striking down a prohibition on "charges or complaints against any employee of the District" during the open sessions of District meetings.  Baca v. Moreno Valley Unified Sch. Dist., 936 F. Supp. at 725.  The plaintiff argued that the restriction was a prior restraint.  See 936 F. Supp. at 727.  Judge Timlin, although striking down the restriction as viewpoint-based, see 936 F. Supp. at 730, wrote that the

> [p]laintiff is wrong because the policy, which merely prohibits certain speech by persons already admitted to and making use of a public forum, is not a true or classic prior restraint, because it does not give a public official the power to deny use of the forum in advance of the actual expression.  Westbrook v. Teton Cnty. Sch. Dist. No. 1, 918 F. Supp. 1475, 1481-1482 (D. Wyo. 1996)(Westbrook, J.). Instead, the policy is a species of censorship, i.e., a "present government interference with or suppression of expression" accomplished through a "'regulatory, proscriptive or compulsory' exercise of governmental power." Keene v. Meese, 619 F. Supp. 1111, 1118 (E.D. Cal. 1985)(quoting Laird v. Tatum, 408 U.S. 1, 11 (1972)).

Baca v. Moreno Valley Unified Sch. Dist., 936 F. Supp. at 727.

For the foregoing reasons, the Court concludes that Section 5Ff is not a prior restraint, and will thus not apply enhanced scrutiny on that basis.

**D.    SECTION 5Ff IS FACIALLY INVALID ON FIRST AMENDMENT GROUNDS, BECAUSE IT IMPOSES A VIEWPOINT-BASED SPEECH RESTRICTION ON A LIMITED PUBLIC FORUM, AND THE RESTRICTION DOES NOT PASS STRICT SCRUTINY.**

The Court concludes that Section 5Ff violates the First Amendment and is facially invalid.  The proper standard to apply to Section 5Ff is neither Broadrick v. Oklahoma's substantial overbreadth requirement nor United States v. Salerno's requirement that "no set of circumstances exist under which the Act would be valid."  Rather, the proper analysis for assessing Section 5Ff's constitutionality is First Amendment forum analysis.  First, the Court determines that the public input portion of the Governing Body meetings constitutes a limited public forum, and, thus, "[a]ny government restriction on speech . . . must only be reasonable in light of the purpose served by the forum and be viewpoint neutral."  Shero v. City of Grove, Okla., 510 F.3d at 1202.  Second, the Court concludes that Section 5Ff is not viewpoint-neutral, because it disallows speech promoting one viewpoint -- criticism of the government and its employees -- while allowing others.  Third, the Court concludes that -- although a viewpoint-based restriction might be constitutional if it passes strict scrutiny -- Section 5Ff fails strict scrutiny, and is thus unconstitutional.  Last, the Court will explain in detail why: (i) forum analysis, not substantial overbreadth, supplies the applicable standard of judicial scrutiny; and (ii) the Court cannot construe Section 5Ff narrowly to avoid its constitutional infirmities.

**1.    The Governing Body Meetings, Including the Public Comment Periods, Constitute a Limited Public Forum, and, Therefore, Speech Restrictions Need Only Be Reasonable and Viewpoint-Neutral.**

The Court concludes that Governing Body meetings -- and the public input portions in particular -- constitute a limited public forum for First-Amendment purposes.  The Tenth Circuit has held that "it is not entirely clear whether a city council meeting should be treated as a 'designated public forum' or a 'limited public forum,'" Shero v. City of Grove, Okla., 510 F.3d at

1202, but, applying the factors in <u>Summun v. City of Ogden</u>, 297 F.3d 995, 1002 (10th Cir.

2002), the Court concludes that Governing Body meetings are limited public forums.

> The appropriate standard of Free Speech Clause analysis depends on the classification of the forum.  [A] . . . forum may constitute: (1) a traditional public forum (e.g., parks and streets), (2) a designated public forum (<u>i.e.</u>, the government voluntarily transforms a nonpublic forum into a traditional public forum, thereby bestowing all the free speech rights associated with the traditional public forum, albeit on a potentially temporary basis, onto that now 'designated public forum'), or (3) a nonpublic forum (i.e., the government retains the right to curtail speech so long as those curtailments are viewpoint neutral and reasonable for the maintenance of the forum's particular official uses).  <u>See</u> <u>Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.</u>, 473 U.S. at 800; <u>Perry Educ. Ass'n v. Perry Local Educators' Ass'n</u>, 460 U.S. at 45-46.  In classifying a particular forum as either a designated public forum or nonpublic forum, we begin with consideration of the intent of the relevant governmental entity.  <u>See</u> <u>Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.</u>, 473 U.S. at 803 ("We will not find that a public forum has been created in the face of clear evidence of contrary intent, . . . nor will we infer that the government intended to create a public forum when the nature of the property is inconsistent with expressive activity.")
>
> . . . .
>
> A 'limited public forum' is a subset of the nonpublic forum classification.  <u>See</u>, <u>e.g.</u>, <u>Summum v. Callaghan</u>, 130 F.3d 906, 914 (10th Cir. 1997)("In more recent cases, . . . the [Supreme] Court has used the term 'limited public forum' to describe a type of nonpublic forum . . . .").  A limited public forum arises where "the government allows selective access to some speakers or some types of speech in a nonpublic forum, but does not open the property sufficiently to become a designated public forum."  <u>Summum v. Callaghan</u>, 130 F.3d at 916.

<u>Summum v. City of Ogden</u>, 297 F.3d 995, 1002 & n.4 (10th Cir. 2002).

Neither the Governing Body meeting as a whole nor the public comment portion

constitutes an "intentional opening [of] a nontraditional public forum," <u>Cornelius v. NAACP</u>

<u>Legal Defense & Educ. Fund, Inc.</u>, 473 U.S. at 802, that "voluntarily transforms" it "into a

traditional public forum," <u>Summum v. City of Ogden</u>, 297 F.3d at 1002.  The core pursuit of

Governing Body meetings is to make decisions and conduct business on behalf of the

municipality.  To assist itself in this core pursuit, the Governing Body has chosen to open its

meetings to limited public comment so that it can be informed of its constituents' opinions, and, with this information, be better situated to make decisions that are more democratic, and, sometimes, more competent.  That having been said, to serve their purpose, Governing Body meetings do not strictly require public input or participation by anyone outside of the Governing Body itself.  Although New Mexico state law requires the Governing Body to open its meetings to the public, neither state law nor the Constitution requires it to let the public speak.  N.M. Stat. Ann. § 10-15-1.

The Governing Body has transformed what would otherwise be a non-forum into some level of speech forum through its Resolutions, which provide, among other things, for a public input period.  The provisions in the Resolutions do not, however, intentionally "bestow[] all the free speech rights associated with the traditional public forum, albeit on a potentially temporary basis."  Summum v. City of Ogden, 297 F.3d at 1002.  The meeting as a whole cannot be a designated forum; designated forums are open to all speech and are subject-neutral, meaning that the government cannot restrict the topics on which individuals speak.  The entire structure of the Governing Body meetings restricts subject matter, partitioning different topics -- "consent regular items," "planning and zoning," "operation business," "council policies," and "appointments," Village of Ruidoso Resolution 2012-16 at 3 -- into different segments of the meeting without allowance for overlap.  It would be hard for a city council to conduct its business without a similar structure.  Even if the public input portion is analyzed on its own, the Court cannot reasonably conclude that the Governing Body has intentionally elevated it to the level of a traditional public forum.[16]  The Governing Body has not left open a courtyard to public

---

[16]The traditional place of the "town hall meeting" as a locus of free and open expression and dissent in the American political tradition gives the Court some pause in concluding that the Governing Body meetings are limited public forums.  New Mexico never was, however, New

protest or opened a university classroom to all comers on a first-come-first-served basis.  See

Widmar v. Vincent, 454 U.S. 263, 265 (1981)(Powell, J.)(holding that where a university

"routinely provides University facilities for the meetings of registered organizations," it may not

selectively disallow "use for purposes of religious worship or religious teaching" (internal

quotation marks omitted)).  The Governing Body has placed numerous reasonable restrictions on

speakers: they must sign up in advance; they may not speak anonymously; they must provide

their address; they must disclose in advance the topic about which they intend to speak; they

must present in turn; they are limited to five minutes; they must each begin their speech with a

thesis sentence describing their topic; they are subject to the authority of a moderator, and, if

they violate the guidelines, then they are directed to cease speaking.  See Village of Ruidoso

Resolution 2012-16 at 4-5.   Moreover, only "resident[s], property owner[s and] business

owner[s] in the Village of Ruidoso" may speak in the public comment portion, which fits with

the Tenth Circuit's description that "a 'limited public forum' . . . 'arises where the government

allows selective access to some speakers or some types of speech.'"  Shero v. City of Grove,

Okla., 510 F.3d at 1202 (quoting Summum v. City of Ogden, 297 F.3d at 1002 n.4).

        Although a number of courts have followed the Tenth Circuit's lead in refraining from

categorizing city council meetings one way or the other, the Court's conclusion comports with

every United States Court of Appeals that has decided the issue: the Fourth, Fifth, Ninth, and

---

England, and town hall meetings in New Mexico have always been republican --
representative -- forms of government.  Moreover, representative government does not have to
open up its meetings to public input.  Case law suggests that, while a forum's pedigree as a
traditional and time-honored setting for free speech activities is determinative to the question
whether a forum is a "traditional public forum" -- the highest level of forum, whose openness to
expressive activities may not be revoked by the government -- it is irrelevant to the question
whether the forum is designated, limited, nonpublic, or not a forum at all.  See Ark. Educ.
Television Comm'n v. Forbes, 523 U.S. at 677.  As the Tenth Circuit has already decided that
city council meetings are either designated or limited public forums, this concern is irrelevant to
the forum analysis.

Eleventh Circuits.  <u>See</u> <u>Fairchild v. Liberty Independent Sch. Dist.</u>, 597 F.3d 747, 759 (5th Cir. 2010)("The Board meeting here -- and the comment session in particular -- is a limited public forum 'for the limited time and topic of the meeting.'"   (footnote omitted)); <u>Steinberg v. Chesterfield Cnty. Planning Comm'n</u>, 527 F.3d 377, 385 (4th Cir. 2008)("In this case the parties agree that the Commission's public meeting was a 'limited public forum,' and we concur in that assessment."); <u>Rowe v. City of Cocoa, Fla.</u>, 358 F.3d 800, 803 (11th Cir. 2004)("As a limited public forum, a city council meeting is not open for endless public commentary speech but instead is simply a limited platform to discuss the topic at hand."); <u>White v. City of Norwalk</u>, 900 F.2d 1421, 1425 (9th Cir. 1990)("[S]uch meetings, once opened, have been regarded as public forums, albeit limited ones."  (citations omitted)).  <u>See also</u> Terri Day & Erin Bradford, <u>Civility in Government Meetings: Balancing First Amendment, Reputational Interests, and Efficiency</u>, 10 First Amend. L. Rev. 57, 77-78 (2011)(footnotes omitted)("The First, Second, Third, Fifth, Sixth, Eighth, and Tenth Circuit Courts of Appeals have struggled with the distinction between a 'designated public forum' and a 'limited public forum,' and consequently, remain unclear how to categorize public comment sessions."  (placing the Fifth Circuit in this category because, although it expressly found that public meetings are limited public forums, it applied an intermediate scrutiny standard closer to the one used for designated public forums)).

### 2.    <u>Section 5Ff Is Not Viewpoint-Neutral</u>.

On its face, Section 5Ff's restriction that "no negative mention will be made of any Village personnel, staff or the Governing Body" is viewpoint-based, because it allows praise or neutral comment, but not criticism or disapproval, about government employees or the Governing Body.  In a limited public forum, the government may impose: (i) content-based restrictions relating to subject matter; and (ii) reasonable time, place, and manner restrictions.

Although Section 5Ff has elements of the latter, it eschews a limitation that could cure its constitutional infirmity: narrowing the phrase "negative mention[s]" to an equivalent phrase that would include only personal attacks and breaches of decorum.

> **a.      Section 5Ff Is a Viewpoint-Based, Not Merely a Subject-Based, Speech Restriction.**

In Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist., 508 U.S. 384 (1993), the Supreme Court struck down a public school district's policy regarding after-school use of its facilities.  See 508 U.S. at 392-93.  The district allowed any local resident or group to use school property for "social, civic, or recreational uses," but explicitly disallowed use "for religious purposes."  508 U.S. at 387.  Although at first blush this restriction appears to be a subject-based, not viewpoint-based, distinction, the district had denied a Christian group permission to show a series of films presenting a Christian approach to parenting.  See 508 U.S. at 392-93.  The Supreme Court held that "[t]he film series involved . . . no doubt dealt with a subject otherwise permissible under [the policy], and its exhibition was denied solely because the series dealt with the subject from a religious standpoint."  508 U.S. at 394.

Here, little supports the contention that the restriction is subject-based rather than viewpoint-based.  It is not clear what the subject matter being limited would be.  Depending upon how the statute is construed, the proscription against "negative mention[s]" applies to a range of disparate topics, from eminent domain decisions (which citizens may praise but not criticize) to allegations of police misconduct or official corruption (which citizens may deny but not support).  Allegations of any kind -- of incompetence, corruption, laziness, dereliction, or personal immorality -- would seem to fall within the proscribed language of Section 5Ff even under its narrowest interpretation.

b.    **Section 5Ff Cannot Be Justified as a "Reasonable Manner" <u>Restriction.</u>**

The Village argues that Section 5Ff constitutes a "time, place, or manner" restriction, which must be reasonable, content-neutral, and narrowly tailored to effectuate a significant government interest, and must "leave open ample alternative channels of communication." <u>Ward v. Rock Against Racism</u>, 491 U.S. 781, 797, 802 (1989).  Such restrictions "do not regulate *what* is said, but merely such matters as *when*, *where*, and *how loud*."  Smolla, <u>supra</u>, § 8:36 (emphasis in original).  The Tenth Circuit has said that "legitimate objectives [of time, place, or manner restrictions] include public safety, accommodating competing uses . . . , controlling the level and times of noise, and similar interests." <u>First Unitarian Church of Salt Lake City v. Salt Lake City Corp.</u>, 308 F.3d 1114, 1132 (10th Cir. 2002).  While these interests may support a speech restriction that prevents disruptive commentary -- <u>i.e.</u>, commentary that makes it difficult to continue -- they likely do not support a restriction that merely seeks to uphold decorum and the dignity of government proceedings.  The United States Court of Appeals for the Ninth Circuit held as much in <u>Norse v. City of Santa Cruz</u>, 629 F.3d 966 (9th Cir. 2010)(en banc)(Thomas, J.). A panel of the Ninth Circuit had initially upheld as a reasonable manner restriction the removal of a man at a city council meeting for rising out of turn and making a Nazi salute at the mayor while the mayor was speaking.  <u>See</u> <u>Norse v. City of Santa Cruz</u>, 586 F.3d 697 (9th Cir. 2010). On en banc review, the Ninth Circuit reversed, holding that the regulation was not a reasonable manner restriction, but rather a viewpoint-based speech restriction, and remanded the case for the determination whether the council had qualified immunity.  <u>See</u> 629 F.3d at 978.  The Honorable Alex Kozinski, Chief United States Circuit Judge for the Ninth Circuit, who would have found that qualified immunity was overcome and remanded the case only for determination of damages, concurred in the judgment:

- 60 -

Councilman Fitzmaurice clearly wants Norse expelled because the "Nazi salute" is "against the dignity of this body and the decorum of this body" and not because of any disruption.  But, unlike der Führer, government officials in America occasionally must tolerate offensive or irritating speech.  See Cohen v. California, 403 U.S. 15 (1971); Duran v. City of Douglas, Ariz., 904 F.2d 1372, 1378 (9th Cir. 1990).

The Supreme Court long ago explained that "in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression."  Tinker v. Des Moines Ind. Cmty. Sch. Dist., 393 U.S. 503, 508 (1969).  Even in a limited public forum like a city council meeting, the First Amendment tightly constrains the government's power; speakers may be removed only if they are actually disruptive.

We've said so twice.  In White v. City of Norwalk, 900 F.2d 1421 (9th Cir. 1990), we explained that speech must "disrupt[,] disturb[ ] or otherwise impede[ ] the orderly conduct of the Council meeting" before the speaker could be removed. 900 F.2d at 1426.  And in Kindt v. Santa Monica Rent Control Bd., 67 F.3d 266 (9th Cir. 1995), we upheld a spectator's ejection from a public meeting only because he was "disrupting the proceedings by yelling and trying to speak when it was not time for" discussion.  67 F.3d at 271.  Had he been given a chance, Norse could no doubt have presented lots more evidence that he never disrupted the Santa Cruz council meeting, but what would have been the point?  The video speaks for itself: Norse raises his hand in a brief, silent protest of the mayor's treatment of another speaker.  The mayor ignores Norse's fleeting gesture until Councilman Fitzmaurice throws a hissy fit.

"Listeners' reaction to speech is not a content-neutral basis for regulation . . . .  Speech cannot be . . . punished or banned[] simply because it might offend a hostile" member of the Santa Cruz City Council.  Forsyth Cnty., Ga. v. Nationalist Movement, 505 U.S. 123, 134-35 (1992).  The council members should have known that the government may never suppress viewpoints it doesn't like.  See Rosenberger v. Rector & Visitors of the Univ. of Va., 515 U.S. 819, 829 (1995).  Though defendants point to Norse's reaction to Councilman Fitzmaurice as the "disruption" that warranted carting him off to jail, Norse's calm assertion of his constitutional rights was not the least bit disruptive.  The First Amendment would be meaningless if Councilman Fitzmaurice's petty pique justified Norse's arrest and removal.

Norse v. City of Santa Cruz, 629 F.3d at 979 (Kozinski, C.J., concurring, joined by

Reinhardt, J.).

Restrictions preventing individuals from harassing government officials at meetings have,

however, occasionally been categorized as reasonable manner restrictions.  In Lowery v.

Jefferson Cnty. Bd. of Educ., 586 F.3d at 433, the Honorable Jeffrey S. Sutton, United States

Circuit Judge for the Sixth Circuit, held that a policy that gave the presiding officer at school

board meetings "the authority to terminate the remarks of any individual who does not adhere to

the above rules or chooses to be abusive to an individual board member or the Board as a whole"

was a valid reasonable manner restriction.  586 F.3d at 433, 434.  Even there, however, Judge

Sutton noted:

> The plaintiffs' second challenge -- that impermissible viewpoint
> discrimination motivated the decision to bar the plaintiffs from speaking -- is also
> unavailing.  No doubt, some evidence (if credited) suggests that disagreement
> with the plaintiffs' viewpoint, not repetitiveness, prompted the denial of the
> second request. . . .
>
> Although the school board may exclude some types of "harassing"
> speech -- if it has the potential to disrupt the meeting, or threatens illegal acts (as
> opposed to the filing of a non-frivolous lawsuit) -- the board may not exclude
> speech merely because it criticizes school officials.  See Police Dep't of Chicago
> v. Mosley, 408 U.S. 92, 96 (1972).  Save for rare circumstances -- say, speech
> promoting drug use at a high school event, see Morse v. Frederick, 551 U.S. 393,
> 403 (2007) -- the First Amendment forbids government officials from regulating
> speech based on their reaction to its point of view, see Police Dep't of Chicago v.
> Mosley, 408 U.S. at 96.
>
> In this instance, however, the jury had ample bases for concluding that any
> potential viewpoint-based motives of the board did not affect the outcome.

Lowery v. Jefferson Cnty. Bd. of Educ., 586 F.3d at 434-35.  In Scroggins v. City of Topeka,

Kan., 2 F. Supp. 2d at 1371 (Crow, J.), a district judge upheld as a reasonable manner restriction

a provision that speakers at a city council meeting may not "mak[e] personal, rude or slanderous

remarks, or . . . become[] boisterous, while addressing the Council."  2 F. Supp. 2d at 1372.

Again, even there, the district court added the following caveat when addressing the issue of

viewpoint neutrality:

> It is clear that the Council's prohibition on personal attacks is not based on
> the Council's disagreement with any particular message, is unrelated to any
> particular viewpoint being expressed, and serves purposes unrelated to the

particular content of the speech.  The Council's rule prohibits personal attacks on anyone, not just City employees or other City officials.  Cf. Leventhal v. Vista Unified School Dist., 973 F. Supp. at 957 (district bylaw prohibiting criticism of District employees is a content-based regulation); Baca v. Moreno Valley Unified School Dist., 936 F. Supp. at 730 (district policy prohibiting "charges or complaints" against District employees is content-based prohibition).   The Council's rule focuses on the inherently disruptive nature of a personal attack in a Council meeting and not on the expressive content of the personal attack.

Scroggins v. City of Topeka, Kan., 2 F. Supp. 2d at 1371.

On the other hand, two district court cases out of California have concluded that a very similar restriction to Section 5Ff were facially invalid viewpoint-based speech restrictions.  In Baca v. Moreno Valley Unified Sch. Dist., 936 F. Supp. at 725, Judge Timlin struck down a policy providing that "[n]o oral or written presentation in open session shall include charges or complaints against any employee of the District, regardless of whether or not the employee is identified by name." 936 F. Supp at 725.  Judge Timlin wrote:

> District's policy clearly contains content-based prohibitions on speech, despite defendants' assertions to the contrary.  It forbids, at the risk of expulsion from the forum, speech which contains any "charges or complaints against any employee of the District, regardless of whether or not the employee is identified by name or by any reference which tends to identify the employee."  It is difficult to imagine a more content-based prohibition on speech than this policy, which allows expression of two points of view (laudatory and neutral) while prohibiting a different point of view (negatively critical) on a particular subject matter (District employees' conduct or performance).  In fact, policies which attempt to suppress or burden only critical speech are regularly held to be content-based.  See, e.g., Westbrook v. Teton Cnty. Sch. Dist. No. 1, 918 F. Supp. 1475, 1494, (D. Wyo. 1996)(holding that a school district's policy, which limited and restricted teachers' speech criticizing other staff members, administrators or school board members by restricting the audience to which such criticisms could be directed, was content-based because it distinguished between favored and disfavored speech on the basis of the views expressed); Rubin v. City of Santa Monica, 823 F. Supp. 709, 713 (C.D. Cal. 1993)(holding that an ordinance granting greater First Amendment rights to "speakers who support 'the human services objectives of the City'" was impermissibly content-based).

Baca v. Moreno Valley Unified Sch. Dist., 936 F. Supp. at 730 (citations omitted).

A year later, another California district judge struck down a school board bylaw providing that "[c]omplaints against an individual employee will not be heard at open Board meetings unless the individual employee consents."  Leventhal v. Vista Unified Sch. Dist., 973 F. Supp. at 954 (alteration in original).  That court decried:

> The Bylaw effectuates a classic form of viewpoint discrimination.  As the *Baca* court noted, the regulation "allows expression of two points of view (laudatory and neutral) while prohibiting a different point of view (negatively critical) on a particular subject matter (District employees' conduct or performance)."  Baca v. Moreno Valley Unified Sch. Dist., 936 F. Supp. at 730. This system engenders discussion artificially geared toward praising (and maintaining) the status quo, thereby foreclosing meaningful public dialogue and, ultimately, dynamic political change.

> The Bylaw fosters yet another form of viewpoint discrimination, unfairly permitting one-sided debate at Board meetings.  As previously discussed, Superintendent Gyves and Board member Vervynck criticized several non-employee speakers.  Yet members of the community at large cannot respond to these charges, even to discuss the same subject matter or issue, if Board President Hubbard determines that their comments relate to a "personnel issue."  In other words, the Bylaw permits the expression of one viewpoint ("complaints" or "charges" against members of the public) but not another ("complaints" or "charges" against District employees).

Leventhal v. Vista Unified Sch. Dist., 973 F. Supp. at 960 (citations omitted).

The Honorable Thomas S. Zilly, United States District Judge for the Western District of Washington, struck down a speech restriction much like Section 5Ff.  See Aldrich v. Knab, 858 F. Supp. 1480 (W.D. Wash. 1994).  Although that case did not involve a city council meeting, Judge Zilly concluded that the forum involved was a nonpublic forum and was thus subject to laxer First Amendment standards than the Governing Body meetings are here.[17]  858 F. Supp. at

---

[17]This case also has overtones of government employee speech regulation, as the individuals against whom the policy was applied worked -- albeit in a volunteer capacity -- for the station.  See 858 F. Supp. at 1494-95.  As the Court noted earlier, government employees receive a lower level of protection from speech-related adverse employment actions than private citizens do from government interference with speech.  See supra note 7.  In any instance,

1493.  In Aldrich v. Knab, a University of Washington-owned campus radio station, KCMU, had

a policy that "on-air criticism of KCMU/University of Washington staff or management policies

is strictly prohibited."  858 F. Supp. at 1486.  Judge Zilly held that the rule was viewpoint-based,

and thus facially unconstitutional.  See 858 F. Supp. at 1493-94.

The Court concludes that Section 5Ff cannot be justified as a reasonable manner

restriction.   Restrictions on the manner of speaking on government property must be:

(i) reasonable; (ii) content-neutral, both as to subject matter and viewpoint; (iii) aimed at serving

a "significant governmental interest"; (iv) narrowly tailored to effectuate that interest; and

(v) crafted to "leave open ample alternative channels of communication."[18]   Heffron v. Int'l

Soc'y for Krishna Consciousness, Inc., 452 U.S. at 648; Ward v. Rock Against Racism, 491 U.S.

---

however, speech restrictions must be viewpoint-neutral, and it is on this basis that Judge Zilly concluded that the radio station's rule was unconstitutional.  See 858 F. Supp. at 1494.

[18]The doctrine surrounding time, place, or manner restrictions was designed to lower judicial scrutiny of speech restrictions that regulate less important, non-content aspects of speech.  In a traditional public forum or designated public forum, the government can thus avoid strict scrutiny -- the standard that normally applies to these forums -- by establishing, at the threshold, that the regulation merely regulates time, place, or manner.
    Limited public forums and nonpublic forums, however, are already subject to reduced judicial scrutiny: speech restrictions on limited public forums, like the Governing Body meetings, need only be reasonable and viewpoint-neutral, even if they are content-based.  The Court concludes that it would be counter to the purpose of the reasonable time, place, or manner doctrine -- which is to reduce judicial scrutiny of speech restrictions unrelated to content -- to apply a heightened standard to time, place, or manner restrictions in a limited public forum.  See Consol. Edison Co. v. Pub. Serv. Comm'n, 447 U.S. at 545 (Stevens, J., concurring); Smolla, supra, § 8:44.  The Court thus concludes that all speech restrictions on limited public forums -- whether content-based or regulating time, place, or manner -- are subject only to the requirements of reasonableness and viewpoint-neutrality.  See supra note 12.
    For the sake of thoroughness, the Court will still conduct a narrow tailoring analysis, because that would be the appropriate action if: (i) the Governing Body meetings were designated public forums -- although the Court concludes they are not; and (ii) Section 5Ff met the threshold requirement -- content-neutrality -- to be analyzed as a time, place, or manner restriction, although the Court concludes it does not.  The Court's analysis ultimately rests, however, on its conclusion that Section 5Ff is viewpoint-based, which would render it unconstitutional under any of the discussed standards.

at 798-99, 802.  The Court will first consider whether Section 5Ff is narrowly tailored to achieve a significant government interest.  Although reasonable manner restrictions need not be the least restrictive alternative, they must be narrowly tailored.  See Ward v. Rock Against Racism, 491 U.S. at 798-99.   This requirement means that, once a significant government interest is identified, and a speech restriction is crafted to achieve it, the government (i) may broaden the restriction beyond what is necessary to achieve the minimum tolerable level of the significant interest, but (ii) must, at each successive level of broadening, convincingly demonstrate that the broader scope achieves the significant government interest to a greater extent than a narrower scope would.[19]   See Ward v. Rock Against Racism, 491 U.S. 798-99 (stating that reasonable time, place, or manner restrictions must be narrowly tailored, but need not be the least restrictive alternative).

---

[19]The Court will use a hypothetical to illustrate the difference between narrow tailoring and least restrictive alternative.  Assume that a private concert venue has speakers loud enough to damage its patrons' eardrums and that the government identifies a significant government interest in preventing its citizens' permanent hearing loss.  The government presents the Court with convincing evidence that: (i) 100 decibels of noise over two hours -- the length of concerts at the venue -- can cause permanent hearing loss; (ii) exposure to noise between 85 and 100 decibels has a cumulative deleterious effect on hearing over long periods of time, and an individual subjected to that noise level for two hours would need to avoid loud noises over the next several days to avoid permanent hearing loss; and (iii) noise under 85 decibels has never been convincingly proven to lead to ear damage, regardless of the length of time of exposure.

If the government were limited to the least restrictive alternative, then it could only ban the venue from playing sound at or over 100 decibels.  At that noise level, patrons could leave the venue without ear damage, avoid loud noises over the next few days, and avoid permanent ear damage.  The government might even have to permit alternative solutions, like allowing the venue to provide earplugs to patrons at all concerts over 100 decibels.  If the government were required only to promulgate a narrowly tailored restriction, however, it could regulate sound production all the way down to 85 decibels by demonstrating that the less restrictive alternatives -- such as bans on sound above 86 decibels, 88 decibels, 90 decibels, etc. -- achieve the significant government interest less effectively than the 85-decibel restriction.  A restriction on sound above 80 decibels, however, would not be narrowly tailored, because it cannot be demonstrated to be any more effective at achieving the government interest -- preventing permanent hearing loss -- than an 85-decibel restriction.

The Court can imagine three potential government interests that the Village could assert to justify Section 5Ff: (i) preventing disruption of the Governing Body meetings; (ii) maintaining decorum and an atmosphere of respect in the meetings; and (iii) preventing criticism and potentially damaging job-related embarrassment to government employees and the Governing Body.  The first interest is constitutionally permissible.  The third is not.  The second might not be -- Judge Kozinski seems to think that it is unacceptable -- but the Court is unconvinced, and the Tenth Circuit has not spoken on the subject.  See Shero v. City of Grove, Okla., 510 F.3d at 1203 (noting that a speech restriction "was . . . appropriately designed to promote orderly and efficient meetings"); Scroggins v. City of Topeka, Kan., 2 F. Supp. 2d at 1372 ("Several courts, including the Supreme Court, have recognized the government's significant interest in conducting orderly, efficient, effective and dignified meetings of its public bodies."[20]  (citing, e.g., City of Madison, Joint Sch. Dist. No. 8 v. Wis. Emp't Relations Comm'n, 429 U.S. 167, 175 n.8 (1976))).  Even assuming that maintaining decorum in a government meeting is a viable significant government interest,[21] Section 5Ff is not narrowly tailored to achieve it.  Section 5Ff goes beyond what is necessary or even helpful in maintaining decorum in the Governing Body

---

[20]Judge Crow may well be normatively correct in his statement of the law, but the Court does not agree with his characterization of Supreme Court precedent. In City of Madison, Joint School District Number 8 v. Wisconsin Employment Relations Commission, the Supreme Court does not identify any significant government interest; neither that term nor any recognizable variant appears in the opinion at all.  The footnote that Judge Crow pincites in support of his proposition states only that, "[p]lainly, public bodies may confine their meetings to specified subject matter and may hold nonpublic sessions to transact business."  429 U.S. at 175 n.8 (citation omitted).

[21]If the First Amendment permits only the prevention of disruption of government meetings and not the maintaining of decorum, then Section 5Ff is even less justified in its scope. Section 5Ff exists more to, in the words of Judge Kozinski, protect "the dignity of [the Governing] [B]ody and the decorum of th[e] body," than it does to prevent real disruption. Norse v. City of Santa Cruz, 629 F.3d at 979.

meetings.  Less burdensome alternatives would achieve this end just as effectively, such as the City of Topeka's ban on rude or slanderous remarks, or Jefferson County Board of Education's proscription against becoming abusive to the board.  To the extent that Section 5Ff does something that the City of Topeka's ban does not do, it is in service of a different interest -- such as the avoidance of job-related criticism or embarrassment -- that the Constitution does not countenance.  The Village may hope that the Court will interpret the statute down to an appropriate, constitutional size, but -- as the Court will discuss later -- the Court cannot do the Village's narrow tailoring for it.

The primary problem with the argument that Section 5Ff constitutes a reasonable manner restriction, however, has nothing to do with narrow tailoring or significant government interests. Section 5Ff is content-based, and, thus, it fails the threshold test to even be analyzed as a reasonable manner restriction.  See Smolla, supra, § 8:38 ("Genuine time, place, or manner regulations are *by definition* content-neutral."  (emphasis in original)).  To the extent that reasonable manner restrictions have been recognized outside of their core scope of operation -- regulating the mechanical facets of speech, such as decibel limits on speakers and generally applicable fire safety codes[22] -- they must "focus[] on the inherently disruptive nature of a personal attack in a Council meeting and not on the expressive content of the personal attack." Scroggins v. City of Topeka, Kan., 2 F. Supp. 2d at 1371.  See Norse v. City of Santa Cruz, 629 F.3d at 979.  While maintaining decorum in a government meeting may be a significant

_____

[22]Fire safety codes provide a good example of a content-neutral reasonable manner restriction.  A ban on flag-burning is unconstitutional, but a content-neutral ban on the burning of objects in public, which curtails an entire manner of expression, is acceptable.  See R.A.V. v. City of St. Paul, Minn., 505 U.S. 377, 385 (1992)(Scalia, J.)("[B]urning a flag in violation of an ordinance against outdoor fires could be punishable, whereas burning a flag in violation of an ordinance against dishonoring the flag is not."  (citing Texas v. Johnson, 491 U.S. 397, 406-07 (1989))).

government interest -- and this categorization matters for other First Amendment analyses outside the context of reasonable time, place, and manner restrictions -- as a practical matter, any restriction that maintains decorum versus merely preventing disruption may run the danger of being content-based.

Because Section 5Ff does not meet the requirements to be considered a reasonable time, place, or manner restriction, the Court will analyze it under the usual framework for speech restrictions in a limited public forum, which is that it must be viewpoint-neutral and reasonable. Section 5Ff is viewpoint-based in two ways.  First, it shields government employees from negative mention, but not private citizens -- including the other citizens present at the Governing Body meeting.  The Court concludes that the First Amendment does not countenance a speech restriction that shields the government, but not private citizens, from criticism, especially when the interest that the speech restriction serves -- maintaining decorum and preventing disruption in government meetings -- could be stymied equally well by speech directed towards either. Limiting Section 5Ff's applicability to government employees also leads to the same viewpoint-imbalance that existed in Leventhal v. Vista Unified Sch. Dist., 973 F. Supp. at 960, and was referenced in Scroggins v. City of Topeka, Kan., 2 F. Supp. 2d at 1371, because the rule permits the Governing Body to criticize private citizens, while prohibiting private citizens from criticizing the government.  While this may be a less invidious form of viewpoint bias than the bias that speakers may air good and neutral viewpoints, but not negative ones, about the government, it may be harder to rectify with creative construction: it would defy the text of Section 5Ff for the Court to interpret it as applying to private citizens.

The second and more serious way in which Section 5Ff is viewpoint-based is, again, that it allows praise but not criticism of the Governing Body and its employees.  Section 5Ff goes

beyond the prohibition against personal or slanderous attacks upheld in <u>Scroggins v. City of Topeka, Kan.</u>, 2 F. Supp. 2d at 1372, and takes one side of the conversation -- a conversation of public importance, in which citizens opine on their leaders' performance -- off the table, while leaving the other side unimpeded.  The suppression of political dissent is the core evil the First Amendment seeks to prevent, and that the viewpoint suppressed by Section 5Ff is all negative feedback to the government -- rather than one side of a single, discrete issue -- makes things worse, not better, for the rule.  Section 5Ff is a viewpoint-based speech restriction, and, as such, it is subject to strict scrutiny, if it can be upheld at all.

### 3.      Section 5Ff Fails Strict Scrutiny.

The available precedent on viewpoint-based speech restrictions is so hostile that the Court cannot determine if such laws are ever allowed.  <u>See</u>, <u>e.g.</u>, <u>Norse v. City of Santa Cruz</u>, 629 F.3d at 979 (Kozinski, J., concurring)("[T]he government may *never* suppress viewpoints it doesn't like."  (emphasis in original)(citing <u>Rosenberger v. Rector & Visitors of the Univ. of Va.</u>, 515 U.S. 819, 829 (1995))); <u>Child Evangelism Fellowship of S.C. v. Anderson Sch. Dist. Five</u>, 470 F.3d 1062 (4th Cir. 2006)("The ban on viewpoint discrimination is a constant.").  Neither the Supreme Court nor, as far as the Court can tell, any other federal court has ever upheld a statute after concluding that it was viewpoint-based.  "In sum, while the principle forbidding viewpoint discrimination may not be absolute, modern First Amendment jurisprudence has erected an extremely heavy presumption against viewpoint discrimination . . . ."  Smolla, <u>supra</u>, § 3:11.

Regardless, Section 5Ff would not pass strict scrutiny, even if strict scrutiny is available as an escape valve.  Strict scrutiny places the burden on the government to identify a compelling interest -- which it has not done -- and show that the restriction is the least restrictive alternative

for achieving that interest -- which the Court has already established is not the case.  See Korematsu v. United States, 323 U.S. 214, 216 (1944).  Section 5Ff thus fails strict scrutiny.

### 4. The "Substantial Overbreadth" Requirement Does Not Apply to this Challenge, and the Court May Not Save Section 5Ff by Construing It Narrowly.

Although the Court concludes that Griffin's facial challenge to Section 5Ff can in some ways be considered an overbreadth challenge -- namely, the doctrine gives him standing to challenge the restriction and designates that challenge a facial one -- the requirement that "the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep," does not apply once, as here, it is displaced by another constitutional test.  Broadrick v. Oklahoma, 413 U.S. at 615-16.  The viewpoint-discrimination analysis the Court has already performed replaces the "substantial overbreadth" standard, but the core substantive idea of overbreadth doctrine -- that statutes overbroad on First Amendment grounds are facially invalid and not susceptible to judicial narrowing --- remains.

### a. Broadrick v. Oklahoma's "Substantial Overbreadth" Requirement Need Not Be Met to Facially Invalidate Section 5Ff.

In Doe v. City of Albuquerque, 667 F.3d at 1115 (Ebel, J.), the Tenth Circuit entertained a facial challenge to a city ordinance that banned all sex offenders from entering the public libraries.  The challenger was a sex offender, but had not been arrested for violating the ordinance.  See 667 F.3d at 1115-16.  The city argued, and the challenger conceded, that the law had some constitutional interpretations, e.g., it was constitutional as applied to sex offenders with sufficient resources to access other libraries, and thus could not be struck down under the test outlined in United States v. Salerno, 481 U.S. at 745 ("[T]he challenger must establish that no set of circumstances exists under which the Act would be valid.").  See Doe v. City of Albuquerque,

667 F.3d at 1123.   The Honorable David M. Ebel, United States Circuit Judge for the Tenth

Circuit, wrote for a unanimous panel that neither the United States v. Salerno standard nor the

overbreadth doctrine controlled the extent of overbreadth necessary for the Tenth Circuit to

strike down the law as facially invalid.   See 667 F.3d at 1123-27 (stating that, in fact, the

Supreme Court has never used the United States v. Salerno standard, even in United States v.

Salerno itself).   Rather,

> where a statute fails the relevant constitutional test (such as strict scrutiny, the
> *Ward* test [outlining the standard to apply to time, place, and manner restrictions
> on speech in a public forum], or reasonableness review), it can no longer be
> constitutionally applied to anyone -- and thus there is "no set of circumstances" in
> which the statute would be valid.   The relevant constitutional test, however,
> remains the proper inquiry.

Doe v. City of Albuquerque, 667 F.3d at 1127.   The Tenth Circuit then applied the public forum

analytical framework (in lieu of a "substantial overbreadth" analysis), concluded that public

libraries are designated public forums, see 667 F.3d at 1128-29, and found that the ordinance was

not sufficiently narrowly tailored, see 667 F.3d at 1133-34.   In sum, the Tenth Circuit jettisoned

the "substantial overbreadth" requirement applicable to First Amendment challenges when there

is no more specific test, but retained the overbreadth doctrine's standing component and its

posture as a facial challenge.

### b.   The Court Cannot Construe Section 5Ff Narrowly to Avoid Constitutional Infirmity.

Judge Ebel also declined to construe the ordinance narrowly to save its constitutionality

by, e.g., interpreting it to apply only to sex offenders who could afford transportation to another

library, writing that

> [t]he City is correct that "[a]s a general matter, we give all statutes a
> presumption of constitutionality and we must apply the same presumption
> to . . . ordinances."   Gillmor v. Thomas, 490 F.3d 791, 798 (10th Cir. 2007).
> However, this presumption does not apply when the challenged statute infringes

upon First Amendment rights. ACORN v. Municipality of Golden, 744 F.2d at 746 ("[T]hough duly enacted laws are ordinarily presumed constitutional, when a law infringes on the exercise of First Amendment rights, its proponent bears the burden of establishing its constitutionality."). In his complaint, Doe alleged that the City's ban infringed on his right to receive information under the First Amendment by denying him access to the City's public libraries. As discussed above, the Supreme Court has repeatedly recognized that the First Amendment includes a right to receive information. Therefore, the district court correctly concluded that by alleging that the ban infringed this right, Doe set forth a plausible claim for relief.

   As part of its argument regarding the presumption of constitutionality, the City also asserts that the district court failed to observe the "canon of constitutional avoidance," which the City argues "requires a court to avoid striking a law on constitutional grounds when the law is capable of an interpretation that does not trammel upon fundamental rights." However, "the canon of constitutional avoidance does not apply if a statute is not genuinely susceptible to two constructions." Gonzales v. Carhart, 550 U.S. 124, 154 (2007)(internal quotation marks omitted). The City has not pointed to any alternate construction of the ban that would no longer implicate the First Amendment right to receive information. Indeed, as the City itself concedes, the City's ban is unambiguous -- it prohibits "a precisely defined group of individuals listed on sex offender registries" from accessing the City's public libraries. Accordingly, the canon of constitutional avoidance does not apply to Doe's challenge.

Doe v. City of Albuquerque, 667 F.3d at 1120-21 (citations to the record omitted).

   The canon of constitutional avoidance is not a negation of, or an end-run around, overbreadth doctrine. If a court, interpreting a statute -- from its text (and any other legitimate tools of statutory interpretation) and without preemptive narrowing in anticipation of First Amendment problems to come -- finds genuine ambiguity in a statute such that more than one viable interpretation is possible, then, of course, the court should select from among those interpretations that avoid constitutional infirmity. See United States v. Stevens, 559 U.S. 460 (2010)(Roberts, C.J.); United States v. Williams, 553 U.S. 285 (2008)(Scalia, J.). A court should not, however, adopt an interpretation that only constitutional avoidance supports, nor should it narrowly tailor the statute around the Constitution's demands. Doing so usurps the legislative

function -- and, if the statute being interpreted is not a federal statute, violates federalism

principles -- disincentivizes the legislature from crafting narrowly tailored laws, and, in the First-

Amendment context, moots the overbreadth doctrine.

In United States v. Stevens, the Supreme Court struck down a federal statute purporting

to criminalize possession of depictions of "illegal acts of animal cruelty," where the statute

defined animal cruelty as "a living animal [being] intentionally maimed, mutilated, tortured,

wounded, or killed." 559 U.S. at 469, 474. The statute required that the depicted act be illegal in

the state in which the depiction was sold, but the statute did not specify that the act had to be

criminalized by animal cruelty statutes, specifically, and videos of ordinary hunting would thus

satisfy the statute's definition in any location in which hunting is banned by ordinance. See 559

U.S. at 476 (noting that all hunting is illegal in the District of Columbia). The United States

argued, first, that under "the commonsense canon of *noscitur a sociis*" -- that ambiguous terms

can be defined more precisely by looking to neighboring words (such as in a list) -- the Supreme

Court should imply a cruelty requirement onto the acts. 559 U.S. at 474. Second, the United

States urged the Supreme Court to broadly interpret an exception in the statute -- for videos with

"serious religious, political, scientific, educational, journalistic, historical, or artistic value" -- to

save the constitutionality of the statue. 559 U.S. at 478. The United States further noted that the

language of the exception had been fashioned directly from the Supreme Court's own exception

from "obscenity" in Miller v. California, 413 U.S. 15, 24 (1973)(holding that material is not

obscene if it has "serious literary, artistic, political, or scientific value"). See 559 U.S. at 479.

The Honorable John G. Roberts, Chief Justice of the United States, wrote for an 8 to 1

Supreme Court that "[t]he first step in overbreadth analysis is to construe the challenged statute;

it is impossible to determine whether a statute reaches too far without first knowing what the

statute covers."  559 U.S. at 474 (alteration in original)(quoting United States v. Williams, 553

U.S. at 293)(internal quotation marks omitted).   Chief Justice Roberts said that, while

"wounded" and "killed" may be expansive terms, they are not ambiguous, and not susceptible to

a narrowing interpretation.  559 U.S. at 474-75 ("We agree that 'wounded' and 'killed' should be

read according to their ordinary meaning.   Nothing about that meaning requires cruelty."

(citation omitted)).   He noted that, while serious artistic, literary, et al., value transformed

otherwise obscene material into First Amendment-protected speech, such value is not necessary

to render speech protected if it would not otherwise be obscene.  See 559 U.S. at 479-80 ("*Most*

*of what we say to one another lacks* 'religious, political, scientific, education, journalistic,

historical, or artistic value" (let alone serious value), but it is still sheltered from government

regulation."  (emphasis in original)).   Thus, depictions of ordinary hunting that lacked artistic, et

al., significance are still constitutionally protected speech, but the statute -- read without a

limiting construction -- purported to criminalize them when they were sold in jurisdictions, like

the District of Columbia, in which hunting is illegal.  See 559 U.S. at 480.

Chief Justice Roberts addressed the government's next contention, that the Supreme

Court should interpret the statute to include only "extreme" cruelty because that was how the

United States intended to enforce it:

> Not to worry, the Government says: The Executive Branch construes § 48
> to reach only "extreme" cruelty, and it "neither has brought nor will bring a
> prosecution for anything less."  The Government hits this theme hard, invoking its
> prosecutorial discretion several times.  But the First Amendment protects against
> the Government; it does not leave us at the mercy of *noblesse oblige*.  We would
> not uphold an unconstitutional statute merely because the Government promised
> to use it responsibly.
>
> This prosecution is itself evidence of the danger in putting faith in
> government representations of prosecutorial restraint.  When this legislation was
> enacted, the Executive Branch announced that it would interpret § 48 as covering
> only depictions "of wanton cruelty to animals designed to appeal to a prurient

interest in sex." <u>See</u> Statement by President William J. Clinton upon Signing H.R. 1887, 34 Weekly Comp. Pres. Doc. 2557 (Dec. 9, 1999). No one suggests that the videos in this case fit that description. The Government's assurance that it will apply § 48 far more restrictively than its language provides is pertinent only as an implicit acknowledgment of the potential constitutional problems with a more natural reading.

Nor can we rely upon the canon of construction that "ambiguous statutory language [should] be construed to avoid serious constitutional doubts." <u>FCC v. Fox Television Stations, Inc.</u>, 129 S.Ct. 1800, 1811 (2009). "[T]his Court may impose a limiting construction on a statute only if it is 'readily susceptible' to such a construction." <u>Reno v. ACLU</u>, 521 U.S. 844, 884 (1997). We "'will not rewrite a . . . law to conform it to constitutional requirements,'" 521 U.S. at 884-885, for doing so would constitute a " serious invasion of the legislative domain," <u>United States v. Treasury Emps.</u>, 513 U.S. 454, 479, n.26 (1995), and sharply diminish Congress's "incentive to draft a narrowly tailored law in the first place," <u>Osborne v. Ohio</u>, 495 U.S. 103, 121 (1990). To read § 48 as the Government desires requires rewriting, not just reinterpretation.

<u>United States v. Stevens</u>, 559 U.S. at 480-81 (citations omitted).

Chief Justice Robert's opinion appears to lay out a two-step process for applying constitutional avoidance: (i) ascertain a finite number of text-based interpretations, each of which would be defensible without resort to constitutional avoidance -- there may be only one proper interpretation;[23] and (ii) pick the best interpretation from among only those interpretations that render the statute constitutionally valid. What the case definitely holds is that the courts are not to interpret laws by looking back-and-forth between the statute and Constitution, tailoring the contours of the former to meet the demands of the latter -- even if the government asks the court

----

[23]The Court notices a parallel between the doctrine of constitutional avoidance and the <u>Chevron</u> doctrine. Those Justices, such as Justice Scalia, who are most loyal to the doctrines and the most likely to apply them, are also the most likely to keep the "steps" of the doctrines separate: first, determining whether the statute is ambiguous; and, only then, assessing the merits of various permissible interpretations from the first step. These Justices are also the most likely to find that the statute is unambiguous, thus obviating the need to apply the second step of each doctrine. Those Justices more likely to find ambiguity in statutes are more likely to eschew applying the doctrines in the first place, out of their distaste for their second steps -- showing heavy deference to agencies for <u>Chevron</u> doctrine, and upholding facially overbroad statutes, for constitutional avoidance.

for an interpretation that does just that task.[24]   A legislature's passage of an unconstitutional statute does not constitute a transfer of the creative legislative power to the judiciary; in the words of the Honorable Antonin G. Scalia, Associate Justice of the Supreme Court, the Court's ability to save Section 5Ff is limited to "interpretation but [not] invention."   Skilling v. United States, 561 U.S. at 422 (Scalia, J., dissenting, joined by Thomas & Kennedy, JJ.).[25]

---

[24]The Defendants have made no such request in their briefing, nor have they proffered any particular interpretation of Section 5Ff beyond what can be gleaned from its text.  The Court infers from the case law which the Defendants cite that they hope only to defend Section 5Ff as construed to apply only to personal, profane, or slanderous attacks, but they have made no request for a limiting construction at all.  See Defendants' Objections at 2-3.

[25]The Supreme Court -- and Chief Justice Roberts in particular -- appears, however, to be willing to adopt creative interpretations or characterizations of statutes to fit them under the federal government's enumerated powers.  In National Federation of Independent Business v. Sebelius, 132 S. Ct. 2566 (2012), Chief Justice Roberts characterized the Affordable Care Act's monetary penalty scheme for uninsured persons -- the so-called individual mandate provision -- as essentially a vice tax, supportable under the Constitution's Taxing and Spending Clause.  See 132 S. Ct. at 2593-2600 ("The question is not whether [characterizing the individual mandate provision as a tax] is the most natural interpretation of the mandate, but only whether it is a 'fairly possible' one.  As we have explained, 'every reasonable construction must be resorted to, in order to save a statute from unconstitutionality.'"  Id. at 2594 (quoting Crowell v. Benson, 285 U.S. 22, 62 (1932); Hooper v. California, 155 U.S. 648, 657 (1895))); U.S. Const. art. I, § 8, cl. 1 ("The Congress shall have Power To lay and collect Taxes, . . . and provide for the common Defence [sic] and general Welfare . . . ."); Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119-1025.  This case is unusual, in that it turned not so much on an interpretation, per se, of the Affordable Care Act -- there was no dispute over the Act's scope or operation -- but rather on its characterization as a tax.
In Bond v. United States, No. 12-158, 2014 WL 2440534 (U.S. June 2, 2014), Chief Justice Roberts interpreted a statute criminalizing the possession of chemical weapons as not applying to "purely local crimes," such as a woman's use of mildly toxic chemicals to harass her husband's paramour.  2014 WL 2440534, at *11.  Congress passed this statute -- not pursuant to the Commerce Clause, as it passes most criminal statutes -- but under the Treaty Clause, pursuant to an anti-chemical weapons treaty the United States ratified in the 1990s.  See U.S. Const. art. II, § 2, cl. 2 ("[The President] shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur . . . ."); U.S. Const. art. I, § 8, cl. 3 (granting Congress power to regulate interstate commerce); Convention on the Prohibition of the Development, Production, Stockpiling, and Use of Chemical Weapons and on Their Destruction art. VII(1)(a), S. Treaty Doc. No. 103-21, 1974 U.N.T.S. 317, 331; 2014 WL 2440534, at *7.  The statute defined "chemical weapon," in a separate subsection, as any "toxic chemical . . . , except where intended for a purpose not prohibited," and the statute's plain

language covered Bond's conduct.  18 U.S.C. § 229F(1).  See 2014 WL 2440534, at *15-16 (Scalia, J., concurring, joined by Thomas & Alito, JJ.).  Nonetheless, Chief Justice Roberts interpreted the statute to exclude purely local crimes, relying on "background principles of construction" about the reach that Congress intended the statute to have:

> In the Government's view, the conclusion that Bond "knowingly" "use[d]" a "chemical weapon" in violation of section 229(a) is simple: The chemicals that Bond placed on Haynes's home and car are "toxic chemical[s]" as defined by the statute, and Bond's attempt to assault Haynes was not a "peaceful purpose."  The problem with this interpretation is that it would "dramatically intrude . . . upon traditional state criminal jurisdiction," and we avoid reading statutes to have such reach in the absence of a clear indication that they do.

> Part of a fair reading of statutory text is recognizing that "Congress legislates against the backdrop" of certain unexpressed presumptions. EEOC v. Arabian American Oil Co., 499 U.S. 244, 248 (1991).  As Justice Frankfurter put it in his famous essay on statutory interpretation, correctly reading a statute "demands awareness of certain presuppositions."  Felix Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum. L. Rev. 527, 537 (1947).  For example, we presume that a criminal statute derived from the common law carries with it the requirement of a culpable mental state -- even if no such limitation appears in the text -- unless it is clear that the Legislature intended to impose strict liability.  To take another example, we presume, absent a clear statement from Congress, that federal statutes do not apply outside the United States.  So even though section 229, read on its face, would cover a chemical weapons crime if committed by a U.S. citizen in Australia, we would not apply the statute to such conduct absent a plain statement from Congress.  The notion that some things "go without saying" applies to legislation just as it does to everyday life.

> Among the background principles of construction that our cases have recognized are those grounded in the relationship between the Federal Government and the States under our Constitution.  It has long been settled, for example, that we presume federal statutes do not abrogate state sovereign immunity, impose obligations on the States pursuant to section 5 of the Fourteenth Amendment, or preempt state law.

> Closely related to these is the well-established principle that it is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides the usual constitutional balance of federal and state powers.  To quote Frankfurter again, if the Federal Government would "'radically readjust[] the balance of state and national authority, those charged with the duty of legislating [must be] reasonably explicit'" about it.  BFP v. Resolution Trust Corp., 511 U.S. 531, 544 (1994).  Or as explained by Justice [Thurgood] Marshall, when legislation "affect[s] the federal balance, the requirement of clear statement assures that the legislature has in fact faced, and intended to bring into

Unlike the ordinance in <u>Doe v. City of Albuquerque</u>, Section 5Ff does not deal with a peripheral First Amendment right that, with the right styling, could avoid First Amendment implications altogether; Section 5Ff deals directly with free speech.  And, like the statute in <u>United States v. Stevens</u>, no reasonable interpretation of Section 5Ff is constitutionally valid. The Court cannot reasonably interpret Section 5Ff to proscribe only disruptive verbal attacks -- and it certainly cannot interpret it to apply to private citizens as well as government agents -- because it has no basis in the text of the Resolution for such an interpretation. "Negative" can mean "contradicting or opposing the opinion upheld by the affirmative side in a debate or argument," "[i]ndicating opposition or resistance," or "[t]ending to oppose or disagree with that which is considered positive or constructive."  <u>The American Heritage Dictionary of the English Language</u> 879 (William Morris ed., New College ed. 1976).  A "mention" is "[t]he act of briefly or casually referring to something," or "[a]n incidental reference or allusion."  <u>The American Heritage Dictionary of the English Language</u>, <u>supra</u>, at 820.  These terms are broad, but that breadth and vagueness is part of their definition.  Moreover, the various definitions of each of the two words are close to one another in meaning.  Thus, the breadth and vagueness of the phrase "negative mention" is not the result of multiple disparate definitions for the same word creating ambiguity about which meaning is the correct one.  Any reasonable interpretation of Section 5Ff -- that is, any interpretation that the Court could validly reach without distorting

---

issue, the critical matters involved in the judicial decision."  <u>United States v. Bass</u>, 404 U.S. 336, 349 (1971).

<u>Bond v. United States</u>, 12-158, 2014 WL 2440534, at *9 (footnote omitted)(citations omitted)(internal quotation marks omitted).   Regardless whether Chief Justice Roberts' construction of the statute is tenable, it still seems from the quoted text that he construes the statute first -- albeit using "unexpressed presumptions" that closely resemble constitutional analytic standards -- and only subsequently, if necessary, analyzes its constitutionality.

its text's plain meaning -- leaves the restriction: viewpoint-based; restrictive of a large portion of First Amendment-protected speech; broad enough and nebulous enough to be susceptible to government caprice in its discretionary interpretation and enforcement; and, thus, constitutionally infirm.

Some applications of a "no negative mention" rule would pass constitutional muster, for example: (i) prohibiting personal attacks that are irrelevant to the general topic at hand, e.g., allegations of adultery against an elected official; (ii) prohibiting criticism of non-government employees on matters not of public concern, e.g., derision of a neighbor's occupational or sexual lifestyle choices; (iii) prohibiting the use of profanity against anyone or everyone; (iv) prohibiting the use of fighting words; and (v) prohibiting the disclosure of identifying, locating, or otherwise private information by those unhappy with the performance of, e.g., elected officials or police officers. Section 5Ff, however -- fairly construed using the ordinary meanings of its terms -- also has myriad unconstitutional applications, including: (i) prohibiting negative feedback about a proposed government program; (ii) prohibiting disagreement -- even strongly voiced disagreement -- with past government decisions; (iii) prohibiting the attendance of protestors at the meetings, while allowing the attendance of those who intend to speak in support of the people or event being protested; (iv) prohibiting job-related criticism -- even harsh criticism -- of government employees or elected officials; and (v) prohibiting accounts of police brutality, government employee rudeness, or public corruption. The Court concludes that the unconstitutional applications of Section 5Ff are substantial when judged in relation to its plainly legitimate sweep, and Section 5Ff is, thus, unconstitutionally overbroad.[26]

---

[26]The Village is free to enact a reasonable, viewpoint-neutral alternative(s) to replace Section 5Ff. The most obvious way to enact a constitutional provision would be to replace "negative mention" with a clearer, narrower term; a rule resembling the City of Topeka's --

prohibiting speakers from "mak[ing] personal, rude or slanderous remarks, or . . . becom[ing] boisterous, while addressing the Council" -- would pass constitutional muster. <u>Scroggins v. City of Topeka, Kan.</u>, 2 F. Supp. 2d at 1372.  In fashioning its rules, the Village can craft content-based restrictions, so long as they proscribe entire topics, and not only certain viewpoints within a topic.  In this way, the Village can prevent irrelevant or dilatory speech while still allowing room for legitimate dissent.   A prohibition against discussing "government personnel performance" would likely still be too broad -- it would cut off viewpoints in the wide swath of topics in which government employees' performance of their jobs is relevant.  But a partitioning of the public input section into topics -- in the same way that the main agenda is -- would be permissible, even if it resulted in some topics being excluded.  A rule providing that speakers in the public input portion may speak only on subjects to be covered on the main agenda would prevent, <u>e.g.</u>, complaints about a police officer's misconduct during a meeting at which the police are not otherwise discussed, and would certainly prevent personal attacks relating to a government official's -- or anyone else's -- personal life.

   The Village can also impose reasonable manner restrictions.  As a result of the Court's categorization of city council meetings as limited public forums, the judicial scrutiny applied to content-based restrictions is no higher than that applied to reasonable manner restrictions.  The reasonable time, place, and manner restriction analysis is designed to loosen, not tighten, judicial scrutiny, and therefore the Court would apply the ordinary limited public forum standards -- reasonableness and viewpoint neutrality -- without the additional requirement of narrow tailoring around a significant government interest.  <u>See supra</u> notes 12, 18.  The Village, therefore, has no incentive to try to disguise content-based restrictions as reasonable manner restrictions, but it can still pass genuine time, place, or manner restrictions.   Such limitations would include the procedural rules of the public input portion already in place -- such as the requirement to speak in turn and the five-minute limitation -- and could additionally include regulations on the volume of speech, such as: (i) a ban on raising one's voice above a certain level; (ii) the requirement or prohibition of the use of sound amplification equipment; or (iii) the requirement that the speaker speak when recognized, as opposed to standing silent as a form of time-wasting, disrespect, or protest.  Such rules would have to be codified -- written clearly enough to limit excessive discretion -- in advance of their enforcement, as discretionary enforcement of facially neutral rules can constitute viewpoint-discrimination.   See <u>Heffron v. Int'l Soc'y for Krishna Consciousness</u>, 452 U.S. at 649 ("Rule[s must] not [be] open to the kind of arbitrary application that this Court has condemned as inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view." (citations omitted)).  If protestors are loud, but otherwise comply with the rules, and are removed from a meeting despite the absence of a written prohibition -- with clear, discretion-limiting standards -- on intolerably loud speech, it raises the specter that the protestors were removed for their viewpoint, <u>i.e.</u>, that the rule was really fashioned at the point of enforcement, in direct response to the speakers' viewpoint.  The possibility of viewpoint bias in discretionary enforcement is present even in the example of silent protests: although no one can ascertain the viewpoint of a silent protestor from his or her silence alone, circumstances typically make it obvious what the speaker's viewpoint is, <u>i.e.</u>, what the protestor is protesting.  If the protestor's viewpoint could not be ascertained, there would, after all, be little point to a public protest.

The Court will consider anti-silence restrictions further, because they raise a novel question, and because the Village has in place rules that effectively ban speakers from using their five minutes of public input to protest by standing silently.  Sections 5Fd and 5Fe require that "[p]resenter[s] must state their name" and "must state in one or two sentences what the presenter will be addressing before [the] Council"; these provisions appear to prohibit total silence. Village of Ruidoso Resolution 2012-16 at 4.  Because the Court concludes that the Governing Body meetings are limited public forums, time, place, and manner restrictions need be only reasonable and viewpoint-neutral.  See supra notes 12, 18.  The anti-silence rule is viewpoint-neutral, because -- although silence can be used to express a viewpoint -- it is not intrinsically related to any particular subject matter, stance, or category of stances.  The restriction is also reasonable, because one of the purposes of the public input portion of the meetings is for the Governing Body members to receive actionable information from their constituents, and silence conveys almost no information.

This question would be closer if the meetings were designated public forums, but an anti-silence restriction might still pass constitutional muster under two conditions.  First, there must be a significant government interest in "conducting orderly, efficient, [and] effective . . . meetings," Scroggins v. City of Topeka, Kan., 2 F. Supp. 2d at 1372 (opining that such an interest is cognizable), and not merely in preventing the disruption of meetings, see Norse v. City of Santa Cruz, 629 F.3d at 979 (opining that only preventing the disruption of city council meetings constitutes a significant government interest).  Neither the Supreme Court nor the Tenth Circuit has weighed in on this issue.  See supra note 20 and accompanying text.  Five minutes of silence during a meeting is inefficient, but it is not disruptive.  Second, the government must demonstrate that the anti-silence restriction is narrowly tailored to achieve the interest of conducting efficient meetings -- meaning that all lesser restrictions would result in less efficient meetings -- but not necessarily that it is the least restrictive alternative.  See supra note 19; Ward v. Rock Against Racism, 491 U.S. at 789-99.  Silence -- more than almost any other identifiable category of speech -- conveys almost no useable information.  Viewed in light of surrounding circumstances, it often conveys the viewpoint -- in broad strokes -- of the speaker, as well the extent of the speaker's displeasure, resentment, contempt, or disagreement with the opposing viewpoint(s).  Silence, however, provides observers with no clues as to the reasoning supporting the viewpoint, alternative proposals, the speaker's motives and stake in the debate, or how the speaker intends to react to the outcome of the debate.  Even assuming that there is value in government officials being exposed to the unarticulated, unexplained, up-or-down opinions of its constituents, requiring those constituents to use that same time period verbalizing their displeasure is a comparatively better use of the time: at best, the constituent may convey useable information; and, at worst, even if the constituent merely states his or her unembellished viewpoint, verbalizing that viewpoint removes some of the potential ambiguity of silence and reduces the chances that the viewpoint will be misunderstood.  In short, a meeting without drawn-out periods of awkward silence will be more efficient than one that contains them, and an anti-silence rule likely satisfies the requirements of narrow tailoring.  The final requirement, that the restriction leave open ample alternative channels of communication, is met, as there are myriad other methods through which to convey a viewpoint or conduct a protest in a city council meeting other than silence -- to say nothing of alternative channels that exist outside of the meeting.  An anti-silence restriction on public comment sessions would, thus, be constitutional even if the session was configured in such a way as to constitute a designated public forum.

The Court cannot shrink Section 5Ff's scope beyond the fair meaning of its terms, and the Village is therefore stuck with the Resolution that it passed.  If it had wanted a rule like the City of Topeka's, it would have passed one.  It did not create such a rule, however, and neither can it rely on the Court to short-circuit the legislative process and pass a constitutionally permissible rule on its behalf.  The federal courts cannot assume the authority of a municipal legislature merely to avoid the effects of their own work in enforcing the Constitution.  The Court concludes that Section 5Ff is facially invalid.

## II.   GRIFFIN'S OBJECTIONS FAIL TO POINT TO ANY ERROR BY JUDGE WORMUTH, EXCEPT FOR THE DENIAL OF INJUNCTIVE RELIEF RELATING TO SECTION 5Ff.

The Court will overrule all of Griffin's Objections except for his request for an injunction preventing the Village from enforcing Section 5Ff, see Griffin's Objections at 14; Complaint ¶ 102b, both for the reasons outlined by Judge Wormuth in the PFRD and because the Court concludes that the public input section of the Governing Body meetings was a limited public forum.  Griffin concedes that, "if the Village did NOT create a designated public forum by allowing the public to appear on the Village agenda, then the personal aspects of his case are doomed (Plaintiff's facial attack on the 'Public Input' portion's restriction of content may still be upheld as unconstitutional, however)."  Griffin's Objections at 2-3 (emphasis in original).  The Court concludes that the Governing Body meetings were not designated public forums, but, because Judge Wormuth's analysis reaches the correct result without deciding the nature of the forum, the Court will sign on to the analysis that Judge Wormuth used.  Last, the Court will grant Griffin's request for injunctive relief relating to Section 5Ff, because Griffin has no adequate legal remedy -- declaratory relief is an equitable remedy -- and because he may suffer irreparable harm in the absence of an injunction.

A.     THE COURT OVERRULES GRIFFIN'S OBJECTIONS TO COUNT 1.

Judge Wormuth found that, whether the Governing Body meeting was a limited or designated public forum -- which he declined to decide -- Griffin suffered no infringement of his First Amendment rights when the Governing Body refused to put him on the agenda, because he was allowed to speak during the public input section of the meetings.  Griffin contends that Judge Wormuth erred when he treated the "agenda" and "public input" portions of the Governing Body meeting as parts of a whole rather than separate events creating separate forums, and refused to decide what forum the "agenda" portion of the Governing Body meeting alone created.  As a result of this error, he argues, Judge Wormuth then improperly considered only whether Griffin had alternative channels of communication for his speech and improperly concluded that he did, in spite of Griffin being "thrice denied" placement on the agenda.

The flaw with Griffin's position is that, as Judge Wormuth pointed out, Griffin has failed to demonstrate that his speech was restricted.  Griffin's Objections at 13.  Griffin contends that this finding is improper speculation by the Court, relying on Doe v. City of Albuquerque, 667 F.3d at 1121.  Doe v. City of Albuquerque does not, however, present an analogous situation. There, in the portion of the case that Griffin cites, the Tenth Circuit was considering whether the plaintiffs had sufficiently alleged the infringement of their First Amendment rights to survive dismissal under rule 12(b)(6) of the Federal Rules of Civil Procedure.  The Tenth Circuit held that the claim should survive dismissal, because the challenged ordinance was a complete ban of all sex offenders from all public libraries in Albuquerque, New Mexico.  Here, in the posture of summary judgment, as Judge Wormuth correctly noted, Griffin presented no evidence of infringement on his First Amendment rights, because he was never barred from any Governing Body meeting nor prevented from speaking at one.  To the extent that Griffin argues that the

Defendants violated his right to free speech by requiring him to wait until the public input period, the Court does not adopt that position.  As the Supreme Court has explained, "the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired."  Heffron v. Int'l Soc'y for Krishna Consciousness, Inc., 452 U.S. at 647.

Griffin also contends that his speech was subject to improper prior restraint, because, after the Governing Body's October 8, 2012, denial to place him on the agenda of the October 9, 2102, meeting, it failed to explicitly invite him to speak during the public input section of the same meeting, but instead advised him to file a formal complaint with the Village. Nowhere, however, in the operative Resolution did it state that a speaker had to be invited to speak during the public input section, nor did Bryant's statement that Griffin should file a formal complaint indicate that Griffin would be unable to speak during the public portion of the meeting, nor does Griffin allege that anyone tried to bar him from speaking at that meeting during the public input portion.  Cf. Farnsworth v. City of Mulvane, Kan., 660 F. Supp. 2d 1217, 1228 (Belot, J.)(D. Kan. 2009)(holding that removing a speaker from a City Council meeting rather than allowing that person to speak during the public comment section of the meeting constituted a unconstitutional restriction on speech).

The Court agrees with Judge Wormuth that the only cognizable restriction Griffin suffered by the Governing Body not placing him on the agenda was the imposition of a five-minute time limit applicable to the public input period but not to the regular agenda.[27]  Because such a time limit is constitutional even under the strict scrutiny standard, Griffin suffered no

---

[27]In fact, for at least one of the Governing Body meetings at which Griffin wished to speak, he was granted twice the time limit otherwise applicable.  See Letter from Daniel A. Bryant to William N. Griffin at 1, filed August 27, 2013 (Doc. 1-2).

unconstitutional restriction.  See Schero v. City of Grove, Okla., 510 F.3d at 1202-03 (upholding a more restrictive time limitation than the one here -- three minutes).

This conclusion also resolves another objection Griffin raises about the PFRD.  Griffin complains of Judge Wormuth's failure to decide whether the relevant forum was designated public forum or a limited public forum.  See Griffin's Objections 29 at 5-7.  Judge Wormuth reviewed, however, the restrictions applicable to Griffin's speech under the more stringent strict scrutiny standard and determined that they passed constitutional muster.  Thus, as in Schero v. City of Grove, Okla., Judge Wormuth "need[ed] not decide" what First Amendment forum is at issue.  510 F.3d at 1203.   As the Court concludes that the Governing Body meetings were limited public forums, Griffin's argument is not merely moot; the Court has done as Griffin requests and analyzed the forum, and concluded that it is a limited public forum.

Because Griffin has failed to demonstrate that Judge Wormuth erred in determining that the Defendants did not violate his First Amendment rights, the Court will adopt Judge Wormuth's recommendation as to Count 1 and grant that portion of the MSJ.

### B.   THE COURT OVERRULES GRIFFIN'S OBJECTIONS TO COUNT 3.

Griffin contends that Judge Wormuth erred in refusing to find that the portion of the operative Resolution regulating the placement of speakers on the agenda was overbroad, because Griffin needed only to demonstrate "that he was restricted on the basis of the content of his message, though no written restrictions . . . exist."  Griffin's Objections at 14.  As Judge Wormuth stated, it is Griffin's burden to show, based upon the law and facts, that substantial overbreadth exists in the impugned statutory scheme, taken as a whole.  See Virginia v. Hicks, 539 U.S. 113, 122 (2003)("Whether these provisions are severable is of course a matter of state law, and the Virginia Supreme Court has implicitly decided that they are not . . . .  It could not

properly decree that they fall by reason of the overbreadth doctrine, however, unless the trespass policy, *taken as a whole*, is substantially overbroad judged in relation to its plainly legitimate sweep." (emphasis in original)(citations omitted)). Judge Wormuth correctly concluded that, read as a whole, the Resolution expressly provided all those wishing to speak with an opportunity to be heard during Governing Body meetings. It, therefore, could not be seen as reaching a substantial amount of constitutionally protected conduct. See Griffin's Objections at 20. See also Kan. Judicial Review v. Stout, 519 F.3d 1107, 1121-22 (10th Cir. 2008)("To be overbroad, a law must cover a substantial amount of constitutionally protected speech . . . ." (citation omitted)(internal quotation marks omitted)). Griffin's objection fails to point to any flaw in Judge Wormuth's reasoning on this point. The Court overrules this objection.

### C.   THE COURT WILL GRANT GRIFFIN'S REQUEST FOR INJUNCTIVE RELIEF RELATING TO SECTION 5Ff.

The Court will grant Griffin's request for injunctive relief relating to Section 5Ff. See Complaint ¶ 102b, at 19. Judge Wormuth recommends against injunctive relief on the ground that Griffin has an adequate legal remedy. See PFRD at 28. The Court disagrees; declaratory relief is an equitable remedy. See, e.g., Copar Pumice Co., Inc. v. Morris, No. CIV 07-0079 JB/ACT, 2007 WL 5685138, at *2 (D.N.M. Oct. 9, 2007)(Browning, J.)(citing Rienhardt v. Kelly, 164 F.3d 1296, 1302 (10th Cir. 1999)(placing limitations on courts' ability to "grant[] equitable relief -- such as injunctions of important state proceedings or declaratory judgments")). As Griffin's representation of the Iveys, his desire to attend Governing Body meetings, and his conflict with the Governing Body all appear to be ongoing, the Court concludes that Griffin may face irreparable harm -- in the form of being subjected to the same injurious deprivation of speech to which he has already been subjected -- if the injunction is not issued. The Court will,

therefore, enjoin the Village of Ruidoso Governing Body from enforcing Section 5Ff, until it can be replaced with a constitutionally valid alternative.

**IT IS ORDERED** that the Ruidoso Defendants' Partial Objection to Magistrate Judge's Proposed Findings and Recommended Disposition, filed February 26, 2014 (Doc. 28), is overruled, and the Plaintiff's Response to Proposed Findings and Recommended Disposition, filed February 26, 2014 (Doc. 29), is overruled.  The Court adopts in part and rejects in part the Proposed Findings and Recommended Disposition, filed February 12, 2014 (Doc. 27).   The Ruidoso Defendants' Motion for Summary Judgment on Plaintiff's Complaint for Violation of Civil Rights, Damages, and for Declaratory and Injunctive Relief and Memorandum of Law in Support Thereof, filed October 14, 2013 (Doc. 16), is granted in part and denied in part.  Plaintiff William N. Griffin's request for declaratory judgment on Count 3 with regard to Section 5Ff of the Resolution is granted.  Defendant Village of Ruidoso and its agents are enjoined from enforcing Section 5Ff of the Village of Ruidoso Resolution 2012-16, filed October 14, 2013 (Doc. 16-5).

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

William N. Griffin
Ruidoso, New Mexico

*Plaintiff pro se*

Terry R. Guebert
David C. Odegard
Guebert Bruckner PC
Albuquerque, New Mexico

*Attorneys for Defendants Daniel A. Bryant and Daniel A. Bryant, PC*

Richard E. Olson
Stephen Shanor
Hinkle, Hensley, Shanor & Martin, LLP
Roswell, New Mexico

> *Attorneys for Defendants Gus R. Alborn, Debi Lee, Irma Devine, and the Village of Ruidoso*